SOUTH SIDE REALTY COMPANY, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Springfield Court of Appeals, February 6, 1911.

1. **APPELLATE PRACTICE: Cross Appeals: Filing Separate Abstracts.** When cross appeals are taken in any case the parties may file a joint bill of exceptions and have their transcript prepared bringing up all the exceptions to this court, or they may file separate bills of exceptions in the trial court and each party prepare an abstract to be filed in the appellate court, and where the plaintiff on cross appeal took leave to file a bill of exceptions, but it did not appear that such bill was filed, and plaintiff prepared no separate abstract of the record, plaintiff was held not to have perfected its appeal and the same was dismissed.

2. **WATERS: Obstructing Stream: Railroads: Negligence.** In a suit for damages against a railroad company for maintaining a bridge across a creek which dammed up the natural watercourse and resulted in the overflow of plaintiff's land, it appeared that defendant had been notified several times that the bridge constituted an obstruction and that during heavy rains at different periods plaintiff's land had been overflowed. Before the last flood defendant made alterations in the bridge, but failed to remove a large girder and piling, which could have been removed and which continued to act as an obstruction to the flow of the water. The evidence is examined and *held* sufficient to justify a finding that defendant had been negligent in the construction and maintenance of the bridge.

3. **RAILROADS: Constructing Bridges: Obstructing Stream.** Although a railroad company may have a right, under its franchise, to construct a bridge across a stream, yet in the construction and maintenance of such bridge it is required to

use ordinary care, so as to avoid injury to the property and rights of others, and our statute (section 3049, R. S. 1909), expressly provides that such company shall restore the stream or watercourse to its former state, or to such a state as not to unnecessarily impair its usefulness.

4. **WATERS: Interfering With Running Streams.** The law has been long established that unless authorized by appropriate constitutional statutory enactment, no one can in any material manner or extent interfere with the waters of running streams in such a way as to invade the rights of others.

5. ————: **Constructing Bridge Across Stream: Anticipating Floods: Railroads.** It is a duty of a railroad company in constructing its road across a stream to provide a passage-way sufficient to allow the flow of water from all such floods as may occur in the ordinary course of nature, but it is not liable for failing to provide for a flood which is not only extraordinary but unprecedented and could not have reasonably been foreseen.

6. ————: ————: ————: ————. In determining the liability of a railroad company for obstructing a watercourse, where the defense is that the damage was inflicted by unusual and extraordinary floods, the history of the country as to the flooding of its streams may be taken into consideration, and where similar extraordinary inundations have occurred within the memory of men then living, their reoccurence should be anticipated and provided against.

7. ————: ————: ————: ————. In a suit for damages against a railroad company for overflow to plaintiff's land caused by the defendant's bridge obstructing the flow of water across the stream, the defense was that the overflow was the result of an extraordinary and unprecedented flood. It appeared from the evidence that the country had experienced similar floods, one in each of the two years immediately preceding the flood for which plaintiff was awarded damages. *Held*, that the evidence was sufficient to present to the jury the question of whether the defendant should have known that such floods were to be expected and to have made due preparation to avoid the injury that might arise therefrom.

8. **ACT OF GOD: Negligence: Anticipating Injury.** Where defendant's negligence concurs with the "Act of God" and so directly contributes to plaintiff's damage, that it is reasonably certain the other cause would not have sufficed to have produced the injury, then the defendant is liable notwithstanding he may never have anticipated the intervention of superhuman force.

9. **NEGLIGENCE: Anticipating Injury.** In actions for tort the general rule is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or could not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act, and are such as according to common experience and the usual course of events might reasonably have been anticipated.

10. **DAMAGES: Injury to Real Property: Measure of Damages.** The general rule as to the measure of damages in actions for injuries to real property is the difference in value before and after the injury to the premises.

11. ————: ————: ————: **Destruction of Improvements: Loss of Rentals.** In actions for damages to real property caused by an overflow, the measure of damages to the land itself is the difference in value of the land before and after the flood, and where houses or fences have been destroyed the measure of damages would be their actual value, or the sum which would be properly expended to restore the premises to their former condition, and in some cases the loss of rental value for the time it would take to restore the improvements should be awarded.

12. ————: ————: ————: **Loss of Sales: Excessive Verdict.** In a suit for damages against a railroad company for overflow to plaintiff's property in 1908 caused by the negligent construction of a bridge across a stream, it appeared from the evidence that about 250 cubic yards of soil had been washed away; that a ditch on plaintiff's land was made wider and deeper, and that plaintiff was unable to sell any lots on this tract of land, but it did not appear whether the sale of lots was prevented on account of the flood of 1908, or the prior floods of 1907 and 1906. *Held,* that under the evidence the verdict of $1000 was excessive.

Appeal from Cape Girardeau Court of Common Pleas. —*Hon. R. G. Ranney,* Judge.

REVERSED AND REMANDED.

*W. F. Evans* and *Moses Whybark* for appellant.

(1) To render a defendant liable for injuries during an extraordinary flood, where he has been negligent, such negligence must have been the active agent in bringing about the loss, and without which it would not

have occurred. It is manifest that the water in Cape La Croix creek would have overflowed plaintiff's land if there had been no railroad bridge nor railroad dump at that point. The girder could have been the efficient cause of any injury to plaintiff by the flood. Coleman v. Railroad, 36 Mo. App. 495; Gillespie v. Railroad, 6 Mo. App. 561; Kenney v. Railroad, 74 Mo. App. 313; James v. Railroad, 69 Mo. App. 431; Brash v. St. Louis, 161 Mo. 433; Standley v. Railroad, 121 Mo. App. 545; Abbott v. Railroad, 83 Mo. 271; Harrison v. Electric Light Co., 195 Mo. 606; Railroad v. Anderson, 61 S. W. 424. (2) If the superior force would have produced the same damage, whether the defendant had been negligent or not, his negligence is not deemed to cause the injury. Johnson & Co. v. Ice Co., 143 Mo. App. 44; Smith v. Fordyce, 190 Mo. 21; Gulath v. St. Louis, 179 Mo. 55; Jones v. Railroad, 178 Mo. 545. (3) Carriers are regarded as insurers, and they are liable if their negligence "Co-operates with the loss." The duty owed by them is construed strictly. Haney v. Kansas City, 94 Mo. 336; Lightfoot & Son v. Railroad, 126 Mo. App. 532. (4) Yet if they are negligent and such negligence is not a co-operative cause of the loss, they are not liable. Davis v. Railroad, 89 Mo. 340; Moffatt Commission Co. v. Railroad, 113 Mo. App. 544; Grier v. Railroad, 108 Mo. App. 565. (5) The plaintiff was not entitled to recover under the facts in this case, such damages as were the result of the act of God, disconnected from the negligent acts of defendant. Owens v. Railroad, 109 Mo. App. 611; Jenkins v. Railroad, 57 L. R. A. 309.

*M. A. Dempsey* and *Frank Kelly* for respondent.

(1) It was the duty of the defendant in constructing the bridge at Cape La Croix crossing "to restore the stream thus intersected to its former state, or to such state as not unnecessarily to have impaired its use-

fulness." R. S. 1909, sec. 3049; Culver v. Railroad, 38 Mo. App. 137. (2) Floods, such as from climatic and geographical conditions may reasonably be expected, whether of frequent or infrequent occurrence, cannot be regarded as extraordinary. Locomotive Co. v. Hoffman, 6 L. R. A. (N. S.) 252 and cases cited in note. (3) The "act of God" is not a justification when the negligence of the individual concurs with it in effecting damage. Brush v. St. Louis, 161 Mo. 433. (4) A railroad company will not be excused from liability for flooding land, although the flood was extraordinary, where its negligence contributed to the injury complained of. Standley v. Railroad, 121 Mo. App. 537; Pruitt v. Railroad, 62 Mo. 527; Commission Co. v. Railroad, 113 Mo. App. 544; Grier v. Railroad, 108 Mo. App. 565; Davis v. Railroad, 89 Mo. 340.

STATEMENT.—This is an action commenced in Cape Girardeau county for damages caused by three successive overflows of Cape La Croix creek. The claim of the petition is that the defendant maintained a bridge across this stream which dammed up the natural wattercourse of the creek, causing the creek to overflow upon the plaintiff's land. The petition was in three counts, for three successive overflows. The jury found a verdict for the defendant on the first and second counts and for the plaintiff on the third count in the sum of $1000, from which the defendant appealed to the St. Louis Court of Appeals. The cause was transferred to this court and the parties have filed their briefs and argued the case, thus eliminating the question of jurisdiction.

The third count of the petition is, in part, as follows:

"Plaintiff further states that said Cape La Croix creek drains a territory extending about ten miles northwest of said crossing; that it flows to the east and south from said crossing by winding course for a

distance of five miles, when it empties into the Mississippi river; that at said crossing its direction is east and west, at right angles to the right-of-way, but that a quarter of a mile west of said crossing it verges to the northwest, and at a point opposite Sulphur Springs crossing is about half a mile distant.

"Plaintiff further states that prior to the year 1907, the western railroad bridge of the defendant at the Cape La Croix crossing was supported by a massive iron girder, five feet wide by forty-six feet long, resting upon two bents of piling each sixteen inches thick and driven into the bed of the stream; that said girder extended down between the banks four and one-half feet and reached from bank to bank; that sometime during the year 1907, the defendant commenced to alter said bridge and in so doing moved said girder out from under said bridge, but instead of removing the girder from the watercourse, neither lifted nor lowered it, but negligently left it relatively in the same position it formerly occupied in the watercourse, except that it stood at the eastern edge of the bridge and had wholly ceased to be a part of it or to furnish it any support or strength; and the defendant negligently wholly failed to remove said bents of piling, although, after the alteration was made, they wholly ceased to be any part of said bridge; that the said girder, after its removal, still reached from bank to bank, its upper edge lying almost level with the tops of the banks and its body extending down into the watercourse four and one-half feet; that said piling and said girder so placed constituted obstructions in said watercourse and when the water rose in the stream acted as a dam and held back the water; that they made the current of the stream, for a great distance above the bridge, much more sluggish and reduced the capacity of the watercourse to carry off the flood waters about one-half.

"Plaintiff states that on the — day of February, 1908, while the defendant was maintaining said obstructions and by reason thereof, the waters of Cape La Croix creek were held back and flowed over its banks and on, over and across the premises of plaintiff, lying on both sides of the creek; that said waters washed the soil thereof and became confined and held back by the embankment of defendant, and remained standing on plaintiff's premises, to the great damage of plaintiff.

"And plaintiff charges that by reason thereof it has been hindered and delayed in the use, improvement, rental and sale of said premises; that it will be put to great expense in restoring the soil washed away by the water; that it was put to expense in endeavoring to protect the premises from further overflows, to the additional damage of the plaintiff in the sum of $1000, for which sum it also prays judgment."

The answer was, besides a general denial, a plea that if plaintiff was damaged at all, such damage was the result of an unusual flood in the stream mentioned and that the defendant incurred no liability therefor.

The first flood occurred on November 17, 1906, the second about December 27, 1906, and the third about February 14 or 15, 1908.

The evidence tended to show that plaintiff, South Side Realty Company, became the owner of the premises, which it claimed was damaged, about July, 1906. The property extended along the west side of defendant's railroad and the Scott county gravel road for a distance of 900 feet north of the creek and something like 400 or 500 feet south of it. The plaintiff corporation was organized for the purpose of buying and selling real estate, erecting hotels, halls, and other buildings, and to purchase, own and rent buildings in the city and county of Cape Girardeau. After it became the owner of the premises in question, it subdivided it into blocks and lots—five blocks and ninety-one lots. The defendant's railroad parallel the property on the east.

The railroad, after leaving the city of Cape Girardeau, runs in a southwesterly direction, and the property claimed to have been damaged is west of the tracks. At the times mentioned the defendant was operating the railroad and maintaining a bridge across the creek. The track crosses the Surphur Springs branch, a half mile north of Cape La Croix creek, the former being dry the greater part of the year. These streams run nearly parallel and the water flows from west to east. In its natural state, Cape La Croix creek is narrow—about fifteen or twenty feet wide—and has, approximately, two or three feet of water. At the point where the railroad crosses, it flows east. At this point, the distance across the waterway at the tops of the banks is about fifty feet, and the depth of the watercourse there, at the deepest place near the middle of the stream, will average fifteen feet. There had been a wooden bridge at this place, but in the year 1902 it was replaced by a steel girder, forty-six feet long and five feet in depth. This girder consisted of two stringers girded together with iron bars and they rested on a rock base in the creek on each side, and on the girder ties were laid. The two pieces of iron that constituted the girder were about four and one-half feet apart and sat immediately underneath the rails. Measurements had been made of the depth of the stream from that bridge and the result showed a depth at the deepest place of ten feet from the bottom of the girder to the bottom of the creek; and on one side it ran up to within one foot nine inches and on the other side within two or three feet, averaging six feet from the bottom of the girder to the bottom of the creek bed. The girder itself extended below the top of the bank five feet from the ties down, and all of the girder was within the watercourse; that is, the top of the girder was even with the top of the bank, and the bottom of the railroad rail was about a foot or a foot and one-half above the top of the bank. A computation was made showing the

number of square feet in the space below the girder and the number of square feet in the surface of the girder which was within the banks of the creek. This measurement showed there were 228 square feet in the space below the girder and 230 square feet in the girder included within the banks of the stream; so that the girder occupied about one-half of the space in the creek bed below the ties of the railroad.

Several letters were written by plaintiff to defendant's superintendent in which it complained of the trestle across Cape La Croix creek, notifying defendant that it was so constructed as to interfere with the flow of the water down the creek in its natural channel, and that such obstruction had caused great damage to property along the track by causing it to be flooded. The defendant, in December, 1906, wrote plaintiff that it would immediately place an order for an additional span to the bridge and make an increased waterway sufficient to take care of the water carried by the stream and that plaintiff could be assured such installation would take place without any more delay. On June 30, 1907, the general superintendent of the defendant was again notified by plaintiff that its failure to improve the bridge as agreed was causing continued damage by reason of the overflow on plaintiff's property; and on this date, the plaintiff was again informed that defendant had a new structure ordered and that in a few days it would commence to make the changes so that the bridge could be installed without further delay. Prior to the time of the last flood and sometime during the year 1907, the evidence tended to show that defendant did commence to alter the bridge, and in so doing moved the girder out from under the bridge; but, instead of removing this girder from the watercourse, it neither lifted nor lowered it but left it in about the same position it formerly occupied in the watercourse except that it stood at the eastern edge of the bridge and had been separated from the bridge so as not to

form any part of it.  Also, that defendant had failed
to remove the bents or piling, although they had wholly
ceased to be any part of the bridge.  After the girder
was removed, it still reached from bank to bank, the
upper edge lying almost level with the tops of the banks
and its body extending down into the watercourse some
four and one-half feet so that it constituted about the
same obstruction to the flow of the water in the chan-
nel of the stream that it had prior to its detachment
from the bridge.

The evidence tended to show that the three over-
flows were caused by unusual floods; that the rainfall
on the 17th and 18th of November, 1906, was 2.82 inches;
on the 15th of December, 1906, 2.28 inches; and on the
14th and 15th of February, 1908, 3.92 inches; and that
the resultant overflows were almost unprecedented in
the history of that community.  The plaintiff's evidence
tended to show that the last overflow causing damage
to plaintiff's property was occasioned by the condition
of the bridge.  At this overflow, there was a difference
in the height of the water on the west and east sides
of the bridge of as much as four feet.

The evidence showed that the property in question
cost plaintiff about $3500, but was worth considerably
more.  After the second overflow, plaintiff expended
some thirty or forty dollars in building a levee.  The
plaintiff had built a four-room frame house on one of
the lots and had rented it at eight dollars a month, but
during the flood of 1908 the water entered the house
and was up to within eight inches of the window-sill.
The plaintiff sold the lots on easy terms—at four or
five dollars a month—for from $90 to $200, each, aver-
aging, perhaps, $125.  The evidence tended to show that
after the last flood plaintiff was unable to sell any more
of the lots, plaintiff's salesman testifying that one of
the reasons the lots were not sold as they were before
the last flood was on account of the overflow.  The
evidence tended to show that some 900 cubic yards of

soil was washed away by the overflows and that it would cost forty cents a yard to restore the dirt to its original position.

NIXON, P. J.—I.   The plaintiff attempted a cross-appeal, and its purported abstract shows the following state of facts: That on the day the jury returned its verdict the plaintiff filed a motion for a new trial setting up (1) that the court erred in admitting evidence over plaintiff's objections; (2) in excluding evidence offered by plaintiff; (3) in granting instructions requested by defendant; (4) that the jury failed to follow instructions; (5) that the finding of the jury is contrary to the evidence; and (6) that the finding of the jury is contrary to law.   That this motion was overruled and affidavit for appeal filed and appeal granted and ninety days given within which to prepare and file bill of exceptions.

When cross-appeals are taken in any case the parties may file a joint bill of exceptions and have their transcript prepared bringing up all the exceptions to this court; or, they may file separate bills of exceptions in the trial court and each party prepare an abstract to be filed in the appellate court.   [Jungeman v. Brewing Co., 38 Mo. App. 458.]   Neither of these courses was pursued by the plaintiff in perfecting its appeal.   It appears that there is no separate abstract of the record, and no bill of exceptions was prepared or filed by the plaintiff in this case; that while plaintiff applied for and obtained leave to file a bill of exceptions, so far as we know, none was filed.   From this statement it appears that no cross-appeal was perfected by plaintiff and consequently its appeal has no existence in this court, and the only course open to this court is to dismiss the plaintiff's abortive appeal as to the finding on the first and second counts of the petition, which is accordingly done.

II. As is seen from the statement of the facts in this case the damages claimed are for an obstruction of Cape La Croix creek by the construction of a railroad bridge across it whereby the water of the creek was dammed up and caused to overflow to the injury of the plaintiff and other riparian owners. The right of the defendant to construct this bridge was a franchise granted it by law. But in the construction and maintenance of such bridge it was required to use ordinary care so that the rights of the owners of property should not be injured. The law has been long established that unless authorized by appropriate and constitutional statutory enactment, no one can in any material manner or extent interfere with the waters of running streams in such a way as to invade the rights of others. Such an interference is *per se* a nuisance, as calculated to produce damage, and it is a maxim of the law in regard to such streams, that the water runs, and ought to run, as it has been accustomed to run through its natural channel. [Abbott v. Railway Co., 83 Mo. l. c. 276.] Our statute has expressly authorized railroad companies to build bridges across streams in the construction of their roadbed, but it also expressly provides that such company shall restore the stream or watercourse to its former state or to such a state as not unnecessarily to have impaired its usefulness. [Sec. 3049, R. S. 1909.]

It is claimed by the appellant that it incurred no liability by reason of the damage inflicted by the floods described in plaintiff's petition because they were unusual and extraordinary, and that the law did not require it to anticipate such injuries, and that it was consequently not required to make preparations to avoid them. A railroad company constructing its road over a watercourse is bound to leave such waterways or openings as are sufficient to afford an outlet for all water that may reasonably be expected to flow through such watercourse, taking into consideration such fresh-

ets as might reasonably be expected to occur in view of the size of the stream, width of its bottom, height of its banks, carrying capacity, and the character of the country contributing to its flow. [Union Trust Co. v. Cuppy, 26 Kan. 754.] It is the duty of a railroad company, in constructing its road across a stream, to provide a passageway sufficient to allow the passage of water from all such floods as may occur in the ordinary course of nature; but it is not liable for failing to provide for a flood which is not only extraordinary, but unprecedented, and could not reasonably have been foreseen. [Houghtaling v. Railroad (Iowa), 91 N. W. 811.] And, in order to determine its liability for obstructing watercourses, the history of the country as to the flooding of its streams is to be taken into consideration. If, at the time of the construction of a railroad, extraordinary inundations have occurred within the memory of men then living, their recurrence should be anticipated and provided against. Hence, where lands have been overflowed by reason of the construction of an embankment by a railroad company, it cannot defend, in an action to recover damages, on the ground that the damage was caused by reason of an extraordinary flood, where it appears that there was a similar overflow at a time thirty-two years previous to the one in question, and that there were two similar overflows, one nine years and the other nineteen years before such previous overflow. [Gulf, C. & S. F. R. Co. v. Pomeroy (Tex.), 3 S. W. 722.]

The question as to whether the defendant should have anticipated the flood that occurred on the 15th day of February, 1908, is to be determined by the evidence in this case. The petition is in three counts, each count claiming damages for a certain distinct flood, the first for the flood of November 17, 1906, the second for the flood of December 27, 1906, and the third for the flood of February 15, 1908. Witnesses who had lived in that country many years and who were famil-

iar with Cape La Croix creek for a period of from twenty to thirty years testified in the case. The defendant introduced evidence tending to show that the floods described in the petition was unusual or extraordinary. The only evidence that it is deemed necessary to embody in this opinion and to call attention to is the record evidence of Prof. Shackelford, one of defendant's witnesses. He had maintained a weather record for the years 1905, 1906, 1907 and 1908, showing the amount of rainfall in the vicinity of Cape Girardeau. This record showed the following condition as to rainfall: "On November 20, 1906, 1.80 inches; on November 21, 1906, 3.55 inches; total rainfall, two successive days, 5.35 inches. On January 2, 1907, 2.35 inches; on January 3, 1907, 2.52 inches; total rainfall, two successive days, 4.87 inches. On February 14, 1908, 1.80 inches; on February 15, 1908, 2.12 inches; total rainfall, two successive days, 3.92 inches."

In the face of this testimony as to the quantities of rainfall at times prior to the flood of February, 1908, there is no reasonable ground for the contention of the defendant that the rainfall on February 14th and 15th, 1908 was so unusual and unprecedented in amount that it could not have been reasonably anticipated and guarded against by the defendant; and this evidence at least presented to the jury the question whether the defendant should have known that such floods were to be expected prior to February, 1908, and we cannot say as a matter of law that the jury was not reasonably authorized in the inference they drew that the defendant should have anticipated and made due preparations to prevent the injuries arising to the plaintiff from the flood of February, 1908. The question of negligence under the evidence in this case was clearly one for the determination of the jury. [Gulf, C. & S. F. R. Co. v. Holliday, 65 Tex. 512.] In the case just cited it was also held that in an action against a railroad company for damages caused by an overflow as a result of the

alleged negligent construction of defendant's roadbed, whether the flood during which the overflow occurred was extraordinary or unprecedented is a question for the jury.

The defendant cannot escape the consequences of its negligence because the flood was an act of God. It is a well-settled principle that, if the defendant's negligence commingled with and operated as a contributive element proximate to the injury, it is liable even though such injury was due to an act of God. In order for the defendant to escape liability under the exemption afforded by law, the act of God must be the sole and only cause of the injury, and this, too, unmixed with the negligence of the defendant, for if the defendant's negligence commingled with it in the loss as an active and co-operative element, and the loss is proximate thereto, or, in other words, is a reasonable consequence of the negligent act, it is regarded in law as the act of the defendant rather than as the act of God. [H. A. Johnson & Co. v. Springfield Ice & Ref. Co., 143 Mo. App. 441, 127 S. W. 692; Brink v. Railway Co., 17 Mo. App. 177; Standley v. Railroad, 121 Mo. App. 537, 97 S. W. 244; Murphy v. Gillum, 73 Mo. App. 487.] This rule of law was again declared by this court in the case of Booker v. Railroad Co., 144 Mo. App. 273, 128 S. W. 1012, as follows: "The rule of law applicable to such cases has been often declared, and is to the effect that if the defendant's negligence concurs with the act of God, in point of time and place, or otherwise so directly contributes to plaintiff's damage that it is reasonably certain that the other cause would not have sufficed to have produced the injury, then the defendant is liable, notwithstanding he may never have anticipated the intervention of superhuman force." [See, also, Pruitt v. Railway Co., 62 Mo. 527; Moffatt Com. Co. v. Railroad, 113 Mo. App. 544, 88 S. W. 117; Davis v. Railway Co., 89 Mo. 340, 1 S. W. 327.]

The instructions given by the court in this case substantially declared the law as it is announced in the above authorities.

W. C. Bahn, who was well acquainted with the bridge, testified: "The probability of the girder in this bridge acting as a dam or obstruction to the water would naturally appear to anyone looking at the bridge. I computed the number of square feet in the space below the girder and the number of square feet in the surface of the girder which was within the banks of the creek. There are 228 square feet in the space between the girder and the bottom of the creek and 230 square feet in the girder itself included within the banks of the creek." It will be seen from this testimony that this girder obstructed the natural flow of the stream through its channel to the extent at least of nearly one-half of the channel. The evidence is beyond question that the defendant was warned of the condition of its bridge and the extent to which it was obstructing the flow of the stream, and that such bridge was causing injuries to the property owners above the bridge. In a letter written to defendant by plaintiff on November 24, 1906, attention was called to the condition of this bridge across this creek, and defendant was therein notified that the same was so constructed as to interfere with the large volume of water which flows through the creek in its natural course, and that during and after heavy rains, this bridge caused a large amount of damage to property along and near the creek on account of the creek being flooded, caused by the breaking of the water for the want of a proper outlet across defendant's right of way. And it was further distinctly stated in this letter that plaintiff and other riparian owners had suffered great damage. To this communication the defendant on December 30, 1906, made the following reply: "Referring to your several communications with reference to overflows of La Croix creek, we will immediately place an order for an additional span, and

make an increased waterway, sufficient to take care of all water carried by this creek, and will push its delivery to the utmost, and you can be assured of its installation without any more delay than is usual with work of this kind." On June 19, 1907, plaintiff again wrote defendant as follows: "On January 30, 1906, you advised us that you would put another span across Cape La Croix creek. By your failure to do so we have been damaged considerably by rains on our property caused by the overflow, and which in addition has hurt the sale of our property. We have not sold a lot on this property since the overflows to which prospective purchasers find objection." To this defendant on June 30, 1907, replied: "Your favor of June 19th with reference to the Cape La Croix creek situation: We have a new structure ordered, and Mr. Brown will within a very few days commence making necessary changes in the foundations so that the bridge can be installed immediately on its arrival." Yet, notwithstanding these repeated warnings, the defendant failed to afford the plaintiff and other property owners the relief from overflows which it had so often promised.

As the evidence tended to show, the railroad bridge at the Cape La Croix crossing was supported by a massive iron girder, five feet wide and forty-six feet long; that it rested upon two bents of piling, each some sixteen inches thick and driven into the bed of the stream; that the bridge was so constructed that the girder extended down between the banks four and one-half feet and reached nearly from bank to bank. After the correspondence between the parties as to the insufficiency of this bridge, during the year 1907, the defendant, pursuant to its agreement, commenced to alter said bridge; in doing this, defendant moved the iron girder from under the bridge, but, instead of removing it from the watercourse so as to prevent the damming of the water and the injurious results occasioned by the overflows, left it practically in the same condition as an ob-

struction across the stream. It was neither lifted nor lowered, but was moved a few feet so that it stood at the eastern edge of the bridge, but disconnected from it, and it furnished no support or strength to the bridge as it had been wholly detached from it. And defendant failed to remove the bents of piling after the alteration was made, notwithstanding they were wholly useless as a part of the bridge. The girder, after its removal, still reached from bank to bank, its upper side being about level with the tops of the banks and its body extending down into the watercourse four and one-half feet, so that it still constituted practically the same obstruction to the flow of the stream as it had prior to its detachment from the bridge; and when the water rose in the stream these obstructions still acted as a dam and caused increased overflows over the land adjacent to the watercourse.

Under this evidence it is sufficiently demonstrated that the defendant, while exercising the privilege granted by the statute, disregarded the duty the law enjoins and so obstructed this stream as to reduce to one-half its capacity for carrying off the water. Not only that: After the consequences of the construction of the bridge were known to the defendant, it continued to maintain the bridge or girder across the channel of the stream and continued to maintain the obstruction after repeated requests to provide an increased waterway and repeated promises on its part to do so, so as to protect the plaintiff and other property owners. But in this work of changing the bridge it moved the massive girder from beneath the bridge, leaving the same and the bents of piling to remain in the watercourse for a considerable period of time and it was in that condition at the time of the flood in February, 1908. The evidence tends to show that there was no reasonable excuse for this delay; that the girder could easily have been raised and supported above the flow of the water, and there is no evidence in the record to show

that defendant could not have removed the piling so as not to constitute an obstruction to the flow of the water. We think the liability of the defendant sufficiently appears from the evidence to authorize a judgment for the damage occasioned to the plaintiff. The facts sufficiently show that the defendant acted in disregard of the property rights of the plaintiff. There devolved upon the defendant corporation the fundamental obligation of all ownership which finds its expression in the maxim, "Sic utere tuo ut alienum non laedas." As said by Mr. Justice FIELD in Baltimore, etc., R. Co. v. Fifth Baptist Church, 108 U. S. 331, 26 L. Ed. 739: "Grants of privileges to corporate bodies confer no license to use them in disregard of the private rights of other persons. The great principles of the common law, which is equally the teaching of Christian morality, so to use one's property as not to injure others,' forbids other application or use of the rights and powers conferred."

III.    The appellant, however, contends that the damages awarded plaintiff—$1000—are excessive. That in its petition it claims damages in the first count for the overflow of November 17, 1906, in the sum of $1000 for restoring the soil washed away and expenses in endeavoring to protect the premises from further over-, flows; that in the second count of the petition, which was for the overflow of December 27, 1906, the plaintiff claims damages in the sum of $1000 because hindered and delayed in the use and improvement and rental of the said premises and because it would be put to great expense in restoring the soil washed away by the water and had been put to great expense in endeavoring to protect the premises from further overflow; that in the third count plaintiff claims damages for the flood of February 15, 1908, in the sum of $1000 for expense it had been put to in restoring the soil washed away by the water, and had been put to great expense in en-

deavoring to protect the premises from further over-flows, and to the use, improvement and sale of the property. The jury, having found on the first count for the defendant, the plaintiff cannot recover on the third count for damages caused by the flood of November 17, 1906; likewise, the jury having found for the defendant on the second count, the plaintiff cannot recover on the third count for the damage done by the overflow of December 27, 1906.

The general rule of damages is that the person suffering the damage is entitled to be compensated for all loss caused by the wrong or injury; and in actions for tort, the general rule is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or could not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act, and are such as according to common experience and the usual course of events might reasonably have been anticipated. The general rule as to the measure of damages in actions for injuries to real property is the difference in value before and after the injury to the premises. Some courts have held that where soil has been excavated or carried away by the wrongful act of another, the party injured is entitled to the cost of restoring it to its former condition. In this state it has been held that in actions for damages to real property caused by an overflow, the measure of damages to the land itself is the difference in value of the land before and after the flood by reason of the particular injuries; and, as to houses or fences, their actual value is the measure of damages. Such value is measured by the sum which would be properly expended to restore the premises to their former condition. If the destruction of the houses or fences or other erections on the premises interfered with the beneficial enjoyment of the premises, then, in addition to the value of the property destroyed, the loss of rental value for the time it would take to re-

store the improvements should be awarded.    [Graves v. Railroad, 69 Mo. App. 574; St. Louis Trust Co. v. Bambrick, 149 Mo. 560, 51 S. W. 706.]

The evidence herein tended to show that prior to the last flood plaintiff had constructed a levee along the creek in order to protect the land from overflow which cost between thirty and forty dollars; but, as the evidence did not show that the third flood injured this levee to any material extent, no recovery could be had for that. There was evidence tending to show that plaintiff had constructed a four-room frame house on the property costing about $425 which it rented at eight dollars a month. It appeared, however, that the tenant stayed in the house until after the third flood and moved out sometime in the year 1908, the plaintiff having sold the house before the tenant moved out. As this house continued to rent at the rate of eight dollars a month for some eight months after the third flood, it is not apparent that plaintiff sustained damage by reason of loss of rent on the house. The evidence tended to show also that by reason of the three floods some 900 cubic yards of earth was washed away from plaintiff's land. On examination after the first flood, the evidence showed, about 400 cubic yards had been washed away. The second flood increased the depth of the channel that previous floods had washed out, cutting deeper and wider, and washed it out farther north, and this flood washed out some 200 cubic yards or more. The evidence further shows that the third flood caused additional damage to the land; that the ditch on plaintiff's land was washed farther down and farther north and was made wider and deeper, and that possibly 250 cubic yards more of soil was washed away. It further appeared that it had cost the plaintiff forty cents a cubic yard to restore the earth. The evidence further showed that the plaintiff corporation was organized and engaged in buying and selling real estate and erecting houses; that after it purchased this tract of land, it laid it out in blocks and lots,

in all, five blocks and ninety-one lots. This was in July, 1906. Prior to the first flood, plaintiff sold eight of these lots; between the first and second flood none were sold; between the second and third flood eight lots were sold; from the time of the third flood to the time of bringing suit no sales were made. The evidence tended to show that after the first flood the plaintiff continued building houses and selling them on the instalment plan or renting them; that before the first flood the property was available for building houses thereon and for improvement, and the evidence tended to show that all the houses put up could have been rented and were available for renting purposes. The agent of the plaintiff who was instructed with the sale of these lots testified as to the effect the flood had upon the salability of these lots and stated that one of the principal reasons the lots quit selling was on account of the floods. He further stated that they had sold no lots after the third flood, but he did not know whether or not it was the flood of 1908 that prevented their sale.

Under the evidence no data is furnished by which, under legal principles, the amount of plaintiff's damages by reason of the failure to market its lots can be ascertained. Nor is it made to appear to what extent the failure to sell the lots was due to the several overflows, separately, or all combined, much less as to how much of such damage accrued to plaintiff by reason of the third flood to which alone the verdict of the jury limited plaintiff's recovery. It will thus be seen that the evidence offered failed to show the special damages to the sale of the lots caused by the third overflow. From the evidence adduced it does appear that the verdict of $1000 was clearly in excess of the damages to which the plaintiff was entitled by reason of the third overflow.

IV.   Some objections were made by the defendant and exceptions saved to the action of the court in admitting evidence, but a careful review of the whole record shows no material error in this connection.

For the reason above stated, the judgment is reversed and the cause remanded.   All concur.