W. A. CHAPMAN ET AL., RESPONDENTS, V. AMERICAN CREOSOTING. COMPANY, APPELLANT.*

In the Springfield Court of Appeals. Opinion filed August 31, 1926.

**1.—Trial—Instruction Held not Erroneous as Ignoring Defense.** In action for pollution of well and spring caused by poisonous fluids escaping from pond of creosote plant, instruction purporting to cover entire case **held** not erroneous as ignoring defense that damages was caused by act of God in an unusual rainfall, where such defense rested on meager testimony as to one incident alone, and evidence for plaintiff tended to prove damage was more or less continuous over period of years.

**2.—Waters and Watercourses—Instruction Held Misleading in Not Limiting Damages.** In action for damages for pollution of well and spring caused by poisonous fluids escaping from pond of defendant creosote plant, instruction **held** misleading in not clearly limiting damages to those accruing within five years prior to bringing of suit, in view of evidence of damage accruing thereafter.

**3.—Same.** Where pollution of well and spring by escaping creosote did not entirely destroy beneficial use, damages were limited to those accruing within five years prior to suit.

**4.—Same—Negligence—Instruction Held Misleading.** In action for pollution of well and spring by escaping creosote from pond of defendant, instruction telling jury that plaintiff should recover if defendant "carelessly and negligently maintained the walls of said pond," etc., held misleading as not instructing jury what facts would constitute negligence.

**5.—Trial—Instruction Held Improper—Allowing Damages not Specially Pleaded.** In action for pollution of spring and well, where item of damages was specially pleaded, instruction on damages for diminution of value of property was improper as allowing speculation on elements of damage not specially pleaded.

**6.—Trial—Instruction Allowing Damages Held Improper.** In action for damages for pollution of spring and well caused by poisonous fluids escaping from pond of defendant creosote plant, where there was no evidence of amount of actual damage specially pleaded, instruction authorizing jury to award damages for diminution in value of plaintiff's property was improper.

**7.—Waters and Watercourses—Trial—Evidence Held Properly Admitted.** In action for damages for pollution of spring and well caused by fluid escaping from creosote plant, evidence of presence of creosote in well on farm situated between plaintiff's place and defendant's plant was admissible as tending to prove creosote came from defendant's premises.

---

*Corpus Juris-Cyc. References: Trial, 38 Cyc, p. 1615, n. 21; p. 1618, n. 36; p. 1634, n. 15; Waters, 40 Cys, p. 600, n. 85; p. 601, n. 92; p. 602, n. 1.

Appeal from the Circuit Court of Lawrence County.—Hon. Charles L. Henson, Judge.

REVERSED AND REMANDED.

*V. O. Coltrane* and *W. B. Skinner* for appellant.

*E. J. McNatt, C. W. Hamlin* and *Hamlin, Hamlin & Hamlin* for respondents.

BAILEY, J.—This is an action for damages on account of the alleged pollution and destruction of plaintiff's well and spring caused by defendant's negligence in permitting poisonous fluids from its creosoting plant to flow onto plaintiff's farm. From a verdict and judgment in the sum of four thousand dollars, defendant has appealed.

The petition was filed December 23, 1921. There have been several trials of this case in circuit court, the last one being in May, 1925, out of which grew this appeal. The petition alleges that plaintiffs are the owners of certain real estate, therein described, amounting in all to about two hundred acres, located near the city of Springfield, Missouri; that on account of its location and water thereon it was

especially adapted to dairy purposes and was bought and used by them for a number of years as a dairy farm; that there was located on this land a well and spring producing an abundance of fresh, pure water; that defendant corporation is and has been engaged in the business of creosoting or treating railroad ties; that in such treatment defendant uses certain fluids containing deadly poison to vegetable and animal life; that this fluid is used in large quantities and drains off from the vats of defendant, where the timbers are treated, through a pipe or drain into a pond constructed and maintained by defendant for the purpose of collecting waste or overflow materials; that "said pond or lake was negligently constructed and is negligently maintained in this, that its banks or walls were insufficient to hold said fluids in that they are not of sufficient height or thickness, and by reason thereof said fluid is permitted to escape and flow down upon plaintiffs' farm." It is further alleged that the pond is on elevated ground "and so located as to be right at the head of a certain draw which develops into a valley and which runs to and through plaintiffs' farm and from said pond or lake and plant of the defendant down and through said valley as aforesaid extends a ravine or branch which carries the fluid or water flowing into and out of said pond or lake, and especially so after heavy rains, down through said ravine into and along over or through plaintiffs' farm either on the surface or through subterranean streams."

It is further alleged that on account of defendant's negligence in permitting the poisonous fluids to flow onto plaintiffs' farm, the well has been "wholly and entirely destroyed" to plaintiff's damage in the sum of $1000; that the spring, after heavy rains, is for long periods of time, unfit for use for furnishing drink for plaintiffs' stock and useless at all times for drinking purposes for plaintiff's family and by reason thereof, plaintiff has been damaged in the sum of $5000; that grass has been destroyed to plaintiffs' damage in the sum of $100. Judgment is asked for the total sum of $6100.

The answer contains a general denial and a further plea that any damages sustained by plaintiff was due to an act of God in an unusual rainfall that could not have been anticipated or guarded against.

Plaintiffs offered evidence tending to prove that they purchased this farm in 1904 for a stock or dairy farm and built a new house on the place and made other improvements; that they kept a number of cows and sold milk to hospitals in Springfield; that after defendant's creosoting plant was built (in 1907), especially during the rainy season, the water in their spring and well became contaminated with creosote; that it would smell of creosote and caused vegetation and grass to die where the water stood which came down the draw from defendant's plant; that this condition caused their cattle to

die and rendered the water in the spring and well unfit for use either for themselves or their cattle.

Caroline Chapman, one of the plaintiffs, testified in part as follows: ''The creosote has been coming down there at least ten or twelve years. It must have been affecting our stock eight or nine years. This creosote dried them up, dried the milk up of the milking cows. We couldn't get no milk out of them. When it rains the water comes out through there and they couldn't get no milk out of them and they commenced dropping their calves and dying, I lost an amount of cattle there. I lost in 1923 five cows. Jersey cows and a couple of Holsteins. The first cow we put in the hog lot, of course the hog lot is right on that branch from the spring and we put it in there for the hogs to eat and the first morning there was two big black sows dead, and the last cow died the first of September, and we had a veterinary examine her. Dr. Duncan was the veterinary. We put her in there and the next morning there was another sow dead and that is the way it has been going. Our cows are sick today. I had to sell the cows to get rid of them or they would all die. We are not in the dairy business now. We had to give it up. Our cows kept dying and I couldn't sell the milk noways. The Hospital didn't quit until they broke up. Mrs. Parker is the lady at the Hospital that looked after it. We have been hauling drinking water from town since 1921 and from the Frisco Hospital. I had no other water for the stock at all except a cistern and of course I couldn't water them out of that. I lost all of my geese and ducks from the water and the last of my big ducks, last summer a year ago, was laying along the branch dead after a rain, and every spring when I used to raise geese and ducks, I used to raise awful big flocks, our neighbors used to depend on us to get their stuff for Christmas and Thanksgiving, and when they go swimming in this little pond the first thing you will go around and see them laying dead. There is no water in that draw during dry time.''

She further testified that in 1921 she made complaint to Mr. O'Neil, manager of defendant company, that, ''I think it was before this suit was started. He didn't appear to want to know it. He just made little of it. Later on they came down to investigate. They did not come until you had notified them. They paid no attention to your notice. I examined the pond up at the creosote plant. The pond—my judgment is about and acre and a half or two acres big and around that pond is a dirt bank and that is the bank on the northeast corner, and when there is a big water it will run through or underneath, seeping through almost all the time, but when there is big water it runs over the bank and at times when there is a heavy rain it breaks through; now fall before last it broke through at two places and the whole stuff come over everybody. No, sir; I didn't

see it at that time, but I have seen it at different times. . . . I saw that it seeped through on the northeast corner. Seeping through and every time I have been there I have seen it seeping through. The reason I made the statement that it broke over a year or two ago is I saw it coming down to our place. It was something awful and I found out it was because it had broken through. There was more come down at that time than we had before or since. It was simply awful and that was what made me investigate. We smelt it all the time after a rain. The pond that the creosote formed would stay there sometimes for a week. Of course, it is not standing there now because it is dry and hasn't been raining much.''

Both plaintiff and defendant had the water in the spring and well analyzed but no creosote was found in the samples. However, a great number of non-expert witnesses testified on both sides on the issue as to the presence of creosote in the water. Defendant offered abundance of testimony tending to controvert plaintiff's evidence on all material points. Such other facts as are pertinent will be referred to hereafter.

Defendant challenges plaintiffs' instruction No. 1, first, because it purports to cover the entire case and at the same time ignores defendant's defense that the damage to plaintiffs, if any, was caused by the act of God in an unusual rainfall. The only direct evidence on that point is contained in the testimony of Mr. O'Neil, manager of defendant company. He testified that in 1919 the dam at the pond broke when 2.67 inches of rain fell in about one and one-half hours. The testimony of Mrs. Chapman heretofore set out cannot be said to refer to the same incident. She was testifying in May, 1925, to an unusual condition when the water broke over the dam ''a year or two ago.'' She refers to no extraordinary rainfall and evidently to something that occurred in 1923. It is quite clear that there was little evidence to substantiate the fact that the damage to plaintiff was caused by an act of God or *vis major,* as some of the authorities say. However that may be, the point is worthy of only slight consideration under the issues raised in this case. Plaintiffs alleged and attempted to prove that the damage was caused by defendant's negligence in erecting and maintaining its dam. If there was sufficient evidence to prove negligence on the part of defendant in erecting or maintaining its dam and the damage to plaintiffs was caused by the concurring force of defendant's negligence and the act of God, defendant is liable unless the act of God or superior force was sufficient to have produced the injury regardless of defendant's negligence. [State ex rel. v. Trimble, 258 S. W. 1013, 1016; Realty Co. v. R. R., 154 Mo. App. 364, 378, 134 S. W. 1034.]

There is no evidence that the extraordinary rainfall (testified to by only one witness out of some eighty who took the stand) was of

such force as to produce the injury complained of regardless of defendant's negligence. Moreover, plaintiffs' case does not rest upon one incident alone and should not be limited to that extent. The evidence tended to prove the damage to plaintiff was more or less continuous over a period of years. What occurred at one particular time would seem to be of slight import when a period of years is under contemplation. This defense apparently was not seriously pressed by defendant during the trial and we do not consider defendant injured by the failure to refer to that defense in plaintiffs' instruction. The facts in the case at bar are in no sense similar to those of Bailey v. Wabash, 207 S. W. 83, cited by appellants. In that case there was but one flood which caused the damage and the defense of the act of God was a vital issue in the case. An instruction ignoring that defense was held erroneous and we think properly so. This point is ruled against defendant.

It is also contended that plaintiffs' instruction No. 1, is erroneous because it permitted the jury to take into consideration damages which did not accrue within five years prior to the date of filing the suit, to-wit: December 23, 1921, and also permitted the jury to consider damages that may have accrued subsequent to that time and might accrue in the future. In other words it is contended that the issues submitted to the jury contemplated permanent damages. The instruction is long and we shall set it out only in part. It begins with this language: "You are instructed that if you find and believe from the greater weight or preponderance of the evidence that the defendant at any time within five years previous to December 23, 1921, the date of filing this suit, maintained a plant and was engaged in the business of treating railroad crossties or other timbers in or near the city of Springfield, Missouri, by a certain process commonly known as creosoting, and that said treatment consists in the main in the dipping or immersion of said railroad crossties or other timbers in certain liquids commonly known as creosote or zinc chloride and that certain waste liquids from the plant are permitted to flow into a pond or lake nearby and which pond or lake was constructed and maintained by the defendant and that lying alongside or nearby said pond or lake are the yards of defendant company, in which tram cars are loaded with crossties or other timbers and run into the treating vats or retorts of defendant for the purpose of being treated and that after said treatment, said cars so loaded in the manner aforesaid are again run out into the yards and timbers thereon permitted to stand and drip." The instruction ends as follows: "and if you further find from the evidence that the defendant negligently and carelessly constructed the walls of said lake or pond for the deposit of its surplus or escaping fluid, if any, or that it carelessly and negligently maintained the walls of said lake that it failed to confine

the contents thereof in said pond, but permitted the same to flow or seep out of said pond and into the draw above mentioned, and that it finds its way under certain conditions, either in the surface water or subterranean streams, or both, down to and upon, or under, and through plaintiffs' land; and if you further find that the contents of said lake or pond contains substances poisonous to both human, animal and vegetable life.; and, if you further find that the contents of said lake have been permitted to go upon and through the plaintiffs' land in any of the manners aforesaid and to pollute and render unfit for use plaintiffs' said spring and well or either of them for either drinking purposes for plaintiffs' family or their stock, or both, or that it has destroyed vegetation with which it came in contact upon plaintiffs' land or that their stock have suffered from the drinking of said water so polluted in the manner aforesaid and that thereby plaintiffs' home has been rendered less comfortable and enjoyable to them for the purposes for which it was occupied and used by them, then in that event, you will find the issues in the case in favor of plaintiff.''

Plaintiffs concede that they are entitled only to such damages as accrued within five years prior to the date of filing their petition. That is unquestionably the correct theory under the facts in this case. The law is well settled that ''when the wrong done does not involve the entire destruction of the estate, or its beneficial use, but may be apportioned from time to time, separate actions must be brought to recover the damages so sustained.'' [Van Hoozier v. R. R. Co., 70 Mo. 145 l. c. 148.]

A recent case decided by this court cites ample authority to support the same proposition couched in this language, viz., ''When the source of the injury may be removed at any time, the measure of damages is the actual damages sustained up to the bringing of the suit.'' [Frederick v. City of Joplin, 201 S. W. 1147, l. c. 1149.] The facts in the case at bar certainly indicate that the source of the damage might be removed at any time and that the damage would vary from year to year according to the flow of water containing creosote over or through defendant's dam. The evidence shows that during the dry season of the year there was little, if any, indication of pollution of the water in plaintiffs' well or spring from defendant's plant and that it varied in the rainy season as the rain fall might be great or small, long or short, in duration. If in the future, defendant's dam should be sufficient to hold the water containing the alleged deleterious substances at all seasons in the year, then plaintiffs' spring and well might regain their pristine purity unless polluted from other sources. The fact, however, that plaintiffs' farm, spring and well are but a short distance outside the limits of a rapidly growing city of probably 50,000 inhabitants makes the

hope of keeping the water in the well and spring potable and whole-
some, forlorn indeed. Be that as it may, it is clear to us that plain-
tiffs' case was bottomed on the theory of temporary damages as here-
tofore indicated. It then became necessary to instruct the jury that
their verdict should be based on conditions and damages as they ex-
isted and accrued during the five-year period previous to the filing
of the suit. In view of the fact that a great deal of the evidence
in the case dealt with conditions existing and damages accruing aft-
er the filing of the petition, it is not unreasonable to believe a jury
would become confused on the issues unless clearly instructed in re-
gard thereto. In our opinion, plaintiffs' instruction No. 1, from
which we have quoted, is not sufficiently clear to properly guide the
jury on the law and the facts. It is true the instruction is premised
with the words "at any time within five years previous to December
23, 1921, the date of filing this suit," but the wording is such as to
be ambiguous; moreover, following that in the instruction the pres-
ent and past tense is used indiscriminately. No instruction given
clearly limits the jury to a consideration of the damages accruing
during the five-year period. The instruction is misleading in other
particulars. It refers to "subterranean streams" connecting defend-
ant's pond with plaintiffs' well as a basis for recovery. If that fact
were established then an entirely different situation would be pre-
sented. Where the damage is caused by some hidden condition that
by ordinary care could not be foreseen, defendant would be liable
only for damages accruing after it received notice thereof. [Schind-
ler v. Standard Oil Co., 232 S. W. 735, 207 Mo. App. 190; Griffith v.
Lewis, 17 Mo. App. 605.] We believe the instruction is also mis-
leading on the question of defendant's negligence. It tells the jury
that if defendant "carelessly and negligently maintained the walls
of said lake that it failed to confine the contents thereof in said
pond, etc." plaintiff is entitled to recover. The jury is not instruct-
ed as to what facts, if found, would constitute negligence.

The doctrine announced in the leading English case of Rylands v.
Fletcher (L. R. 3 H. L. 330), to the effect that a person restraining
water in a reservoir, which injures another by breaking away, is
liable therefore, regardless of the question of negligence, except when
the damage is caused by an act of God, *vis major* or through the fault
of the injured person, has not been followed in this State. It is neces-
sary to prove negligence on the part of the one maintaining a dam
for ponding of water on his premises. [McCord Rubber Co. v. Water
Co., 181 Mo. 678, 81 S. W. 189; Murphy v. Gillum, 73 Mo. App. 487;
Griffith v. Lewis, 17 Mo. App. 605.] The wording of the foregoing
instruction practically makes defendant an insurer that the contents
of the pond would not escape and injure plaintiff. It was not upon
any such theory this case was tried. Plaintiff, by his petition, charged

specific negligence in that the "banks or walls were insufficient to hold said fluids in that they are not of sufficient height or thickness, etc." Having charged specific negligence plaintiff is bound thereby. As to whether or not the impounding of a mixture of creosote and water gives rise to a different rule than where the dam impounds water only, we do not feel called upon to decide under the issues made by the pleadings. The instruction should not lead the jury to believe that the mere fact that a certain condition existed did in itself constitute negligence but should limit their findings to facts, supported by the evidence, constituting negligence and within the pleadings. [Martin v. Railway, 175 Mo. App. 464, and cases therein cited.]

Plaintiffs' instruction No. 2, informed the jury that if they found the issues in favor of plaintiffs, they should award them such damages as they believed from the evidence would fairly compensate them for the diminution, if any, in the value of their property for the purposes for which they owned, used and occupied it and "in reaching a conclusion on that point you may take into consideration any loss, inconvenience or annoyance, if any, to the items hereinafter enumerated: First, to the destruction of their well, if you find it has been so destroyed, a sum not to exceed $1000; second, for the pollution of their spring, if you find it has been so polluted by defendant, in a sum not to exceed $5000; third, for the destruction of vegetation, if any, not to exceed the sum of $100; in all an amount not to exceed the total sum of $6100."

The item of damages specified in the foregoing instruction were specially pleaded. The jury should not be allowed to speculate on other elements of damages which might occur to them. The damage to plaintiffs' property for the use for which it was owned, unlimited as to time, is more in the nature of permanent damage, which was not pleaded and which we have held not to be an issue in the case. Moreover, there is no proof as to the amount plaintiffs' property, well, spring or grass were damaged. No witness testified as to what plaintiffs lost in value by reason of the pollution of their well and spring. There is no evidence as to what the rental value of plaintiffs' property was either before or after the damages complained of accrued. Our examination of this record fails to reveal any proof of the amount of actual damages suffered by plaintiffs during the five-year period to which they are limited. It is true plaintiffs were unable to use the water for drinking or bathing and that stock died, according to their testimony, by reason of the poisonous condition of the water. But how is the jury to determine the amount of such damage without some proof of the money value? What is the partial loss of the use of a spring on a dairy farm worth over a period of five years? What is the amount of loss to the farm, over the same

period, of plaintiffs' well which has been destroyed? What is the value to plaintiffs of the pasture land destroyed? Such is the nature of the damages pleaded and they are susceptible of proof. [Pinney v. Berry, 61 Mo. 359.] The jury may also have considered the fact, by reason of its incorporation in instruction No. 1, that plaintiffs were damaged because of stock and hogs dying as a result of drinking the polluted water; most of this evidence related to stock dying after the filing of the petition and there is no proof of the value or number of such stock. Moreover, if plaintiffs claimed special damages in that respect, it should have been pleaded. Most of the difficulty in this case has arisen by reason of the fact that the cause was tried more than three years after the petition was filed and much of the evidence covered a period not to be considered in assessing the damages. For that reason the instruction on the measure of damages should have been clear and have properly limited the jury to a consideration of the five-year period immediately prior to the commencement of this suit. We believe this instruction was improper and constituted reversible error.

The evidence shows that defendant's creosote establishment was located at the head of a draw or natural drain, which ran about a quarter of a mile through one Hoffman's land, then across the corner of the Hoover land and then on to the land of plaintiffs. There was also a well on the Hoffman land and evidence was admitted over defendant's objection showing the presence of creosote in the Hoffman well located in or near the draw. This is assigned as error. The trial court is given considerable discretion in the matter of admitting evidence on what might be termed collateral matters. We believe this evidence was properly admitted on the theory of tracing the source of the creosote found in plaintiffs' well and spring. The fact that the Hoffman well was situated above and between plaintiffs' place and defendant's plant and that the Hoffman well was polluted essentially the same as plaintiffs', certainly tended to prove that the creosote came from defendant's premises.

Other errors are assigned, but in view of what has been said a further consideration of this case seems unnecessary. For the reasons stated the cause is reversed and remanded. *Cox, P. J.,* and *Bradley, J.,* concur.