## Louisville & Nashville Railroad Company v. Conn.

(Decided October 21, 1915.)

### Appeal from Garrard Circuit Court.

1. Waters and Water Courses—Obstruction by Railroad—Liability.— In an action against a railroad for damages caused by obstruction of water of a creek by a bridge, the company is liable only in the event that the bridge obstructed the passage of water accumulating from such ordinary and usual rainfalls in the vicinity as might have been anticipated by persons of ordinary experience and prudence, and it is not liable for overflows caused by extraordinary rains or floods, i. e., such as are unusual in the vicinity, and could not have been anticipated by such persons.

2. Waters and Water Courses—Obstruction of Water of Creek—Evidence—Peremptory Instruction.—In an action against a railroad for damages caused by obstruction of water of a creek by a bridge on its road, evidence considered and held to conclusively establish that the rains and flood causing the alleged injury were extraordinary in character and of such unusual occurrence in the vicinity that they could not have been anticipated by persons of ordinary prudence and experience; and that the trial court should have directed a verdict in favor of the defendant.

FRED P. CALDWELL, SHELBY, NORTHCUTT & SHELBY, BENJAMIN D. WARFIELD and LEWIS L. WALKER for appellant.

ROBERT HARDING, J. I. HAMILTON, R. H. TOMLINSON and E. V. PURYEAR for appellee.

Opinion of the Court by William Rogers Clay, Commissioner.—Reversing.

In this suit against the Louisville & Nashville Railroad Company to recover damages to his property, alleged to have been caused by the diversion of the waters of Paint Lick Creek, plaintiff, George W. Conn, recovered a verdict and judgment for $2,000. The railroad company appeals.

Plaintiff's property lies in the town of Paint Lick. At this point Paint Lick Creek runs between the counties of Garrard and Madison. Defendant's railroad runs from Richmond to Lancaster in a southwestern direction. The creek runs in a northwestern direction. The village of Paint Lick is located principally between the railroad track and the creek. The principal street of Paint Lick, which is the Richmond and Lancaster turnpike, crosses the railroad track about eight or nine hundred feet from the railroad bridge on the Garrard side. From this crossing it is about three hundred feet from the pike bridge over the creek. Plaintiff's residence faces this street near the railroad track. Back of plaintiff's residence is his shop, and further back is Rucker's barn. The land back of these buildings is bottom land and is about ten feet lower than the railroad track and the street.

In July, 1909, the railroad company reconstructed its bridge at Paint Lick. At that point the channel proper of the creek is about 160 feet wide. On each side of the channel proper the bank ascends, and from the top of one of these banks to the other the distance is 448 feet. In reconstructing the bridge the company placed two additional stone piers thereunder. These piers were 17 feet high and 6 feet wide. According to the testimony for plaintiff, the stone abutments were lowered 18 inches by taking out two stones, and the bridge was let down 18 inches lower than the old bridge. At the top of the bridge the iron plate girders were 4 feet deep and the rails and cross ties 12 inches deep. The dirt fill on the Madison side was 20 feet high and about 150 feet long. On the Garrard side it was 50 feet long and 20 feet high. Estimating the channel of the creek as extending not from the banks proper but from the ascending bank on each side, about 74 per cent. of the channel, as a whole, was obstructed. One of the engineers who testified for plaintiff stated that the effect of this was to set the waters

back about 6,000 feet east of the bridge. Another engineer, named Tinsley, testified that the new bridge was about 2½ feet below the "old high water mark" of 96.7. He ascertained this fact by consulting a number of men. Plaintiff's proof tends to show that on the occasion of the flood the waters of the creek broke and overflowed the fill and washed away the railroad track for a distance of about 420 feet. Two or three witnesses say that they had seen it rain as hard before. Plaintiff further showed that while the bridge was under construction, W. G. Kemper wrote the superintendent a letter, in which he expressed the opinion that the construction of two more pillars under the bridge would likely cause an overflow of the creek and cause damage to Paint Lick. According to plaintiff's testimony, the water rose in his house for several feet and injured it, and damaged or practically destroyed certain articles of personal property. The water remained in his house for about an hour. It was three hours before the water returned to the channel of the creek. Other witnesses say that the waters went down in from fifteen minutes to an hour. Plaintiff further testified that the water that entered his house came from over the railroad. In the opinion of the witnesses, the value of plaintiff's property was depreciated from forty to fifty per cent. by reason of the reconstruction of the bridge.

According to the evidence for the defendant, the two stones that were removed from the abutments were replaced with creosote timbers and the bottom of the present girder is 2 or 3 inches higher in elevation than the old span. On being apprised of the fear on the part of the residents of Paint Lick that the bridge might cause an overflow, A. F. Frendburg, the company's engineer, made a careful investigation and estimated the Paint Lick water shed as containing 50 square miles. As a matter of fact, the government map showed it to be 46 square miles. To permit the passage of this water required 387 cubic feet per second per square mile. The bridge provided for 478 cubic feet. The high water mark of March, 1913, was 7 feet and 1 inch higher than the old high water mark. The old high water mark was 6.9 feet below the top of the bridge and 2.3 feet below the bottom of the girder. He further stated that the fills on each side of the bridge were not in the natural channel of the stream. In his opinion, the opening under the

bridge was fully adequate, not only to allow the water to pass from usual and ordinary rainfalls and floods, but was sufficient for all previous rainfalls and floods in that vicinity, whether ordinary or extraordinary. Other witnesses testified that the old high water mark was something like a foot and one-half below the girder of the present bridge. It was also shown that the pressure above the fill was not sufficient to push out the fill. It would have taken ten or twelve times the amount of pressure to have done so. The fill was washed out by the water overflowing the fill. Defendant further showed that the bench mark, or the point from which the high water elevations were taken prior to 1909, was 3 feet and 2 inches lower than the bench mark used in 1913. It also appears that the pike bridge some distance below the railroad bridge was washed away.

As to the character of the flood and the height of the waters on the occasion complained of, defendant introduced several witnesses. Dan Bodkins, who lived at Wallaceton, which is five miles above Paint Lick, and who had known Paint Lick Creek for twelve years, testified that the creek was two or three feet higher than he had ever known it before. The tide was a great deal larger and higher than on any previous occasion. Across the bottom the creek was 200 yards wider than he had ever seen it before. There was a hard downpour of rain and bridges, culverts, fences and things which had never been washed out since he had been there, were carried away. William Asher, who lived on Paint Lick Creek about two miles below Wallaceton, stated that Walnut Meadow Creek intersected Paint Lick Creek and lower down White Lick Creek ran into it. He had lived on the Wallaceton prong of Paint Lick Creek for fifteen years and in the Wallaceton neighborhood for over twenty years. He had also lived at Paint Lick for twelve years. In his judgment, the creek was three or four feet higher than it had ever been before. Fences and buildings that had never been carried away were washed away. The creek was 100 yards wider than he had ever seen it on any prior occasion. J. B. Guynn, who lived on Paint Lick Creek about two miles above Paint Lick depot for about fifty-four years, said that at his place the water was from four to four and one-half feet higher during the March, 1913, flood than he had ever seen it before. At his home place further down the creek the water was four and one-

half feet higher than on any previous occasion. This was about a mile above Paint Lick. The water came into his yard and had never been there before during his knowledge of the creek. James Todd, who lived on Paint Lick Creek and had known it for forty years, says that the creek was from four to six feet higher than he had ever seen it before. It was 100 feet wider on the Garrard side. Fences which had never been injured before were washed away. T. J. Todd, who was thirty-two years of age and had known the creek practically all of his life, testified that the water on Walnut Meadow during the March, 1913, flood was three or four feet higher than he had ever seen it before. Paint Lick Creek, after Walnut Meadow flowed into it, was five or six feet higher. Twice as much fencing was washed away as on any previous occasion. Walker Guynn, who was raised and lives on Paint Lick Creek about a mile above the railroad bridge, says that the March flood was about five feet higher at his house than it ever was before. The water was 92 feet further up in his yard than on any previous occasion. W. C. Wynn, who lives on White Lick Creek about a mile above the point where it empties into Paint Lick Creek, says that White Lick Creek was from two to three feet higher than he ever saw it before. Stone fences and wire fences were all pulled down. This never happened to the same extent before. J. T. Thompson, who has lived on White Lick Creek since 1881, about two miles from its junction with Paint Lick Creek, says that White Lick Creek was a foot and one-half higher at his house than ever before and that the creek rose rapidly and washed away fences that had never been washed away before. He further says that it was the hardest rain that he had ever heard fall. C. S. Ballew, who had known Paint Lick Creek for fifty years and who saw the creek about three miles below Paint Lick on the occasion of the flood, says that it was six or seven feet higher at this point than he had ever seen it before. O. J. Hendren, who lived near the turnpike bridge and had known the creek for fifty years, states that the water during the flood of 1913 was six feet higher than he had ever seen it before. J. D. Burchell, who lives on the Madison side, states that the water there was six feet higher in 1913 than he ever had known it before. Will Ross, who lived about a quarter of a mile up Francis Branch from Paint Lick Creek, says that the back water from Paint Lick Creek rose in his

house about two feet. W. L. Todd, who lives at the junction of Walnut Meadow and Paint Lick Creek and who had known Paint Lick Creek for about fifty years, says that never in his recollection was there another flood like the flood of March, 1913. It was the highest water he had ever known in Paint Lick Creek. It must have been four feet higher at his place than ever before. Eliza Ann Todd, his wife, says that the flood was the highest in her recollection and that it did more damage than any previous floods. James G. Champ, who had lived for thirty-one or thirty-two years on the Wallaceton pike about two miles above the railroad bridge, says that the creek in March, 1913, was four or five feet higher than he had ever seen it before, and that fences and things were washed away which had never been carried away before. In dry times the creek was so low that you could walk across it.

By way of rebuttal, plaintiff testified that he had seen it rain as hard as it rained that night in Paint Lick. G. M. Treadway testified as follows:

"Q. Mr. Treadway, had you ever seen rain fall as hard in that vicinity before the flood as you saw it the night of the flood and for as long a time. A. Yes sir, I have seen it rain as hard."

It is the well settled rule in this State that one who constructs a bridge over a stream is liable only in the event that the bridge obstructs the passage of water that accumulates from such ordinary and usual rainfalls in the vicinity as might have been anticipated by persons of ordinary prudence and experience. He is not liable for damages growing out of overflows which were caused by extraordinary rains or floods, i. e., such floods or rains as are of such unusual occurrence in the vicinity that they could not have been anticipated by persons of ordinary experience and prudence. C. St. L. & N. O. R. Co. v. Hoover, 147 Ky., 37; Southern Ry. Co. v. A. M. E. Church's Trustee of Harrodsburg, 121 S. W., 972; Wallingford v. Maysville & B. S. R. Co., 107 S. W., 282. There is no evidence in this case that the waters of Paint Lick Creek were ever obstructed or diverted by either the old bridge or the new bridge, so as to injure the property of the residents of Paint Lick. There is no evidence that the openings in the new bridge were not sufficient to carry off the water that accumulated from such ordinary and usual rainfalls in that vicinity as might have been antici-

pated by persons of ordinary experience and prudence. On the contrary, defendant's evidence conclusively shows that the flood of March, 1913, was unprecedented. This is brought out, not by one or two witnesses living at Paint Lick, but by a number of witnesses who saw the conditions: not merely at Paint Lick but above and below it and throughout the entire watershed of Paint Lick Creek. It is clear from their testimony that the waters of Paint Lick Creek and its tributaries were not only higher but wider and more violent than they had ever been known in the memory of the oldest inhabitants. The testimony of plaintiff and Treadway to the effect that they had seen it rain as hard in no way contradicts the testimony of defendant's witnesses. Both witnesses are silent as to the length of time it rained and as to the effect of the rain on the waters of the creek. Where it is shown, as in this instance, by the evidence of uncontradicted witnesses, that the waters of a creek and its tributaries, both above and below the injured property, were higher and wider than they had ever been known to be before, and were so violent as to reach and carry away fences and other things that had never on any previous occasion been washed away, it must be regarded as conclusively established that the rains and flood were extraordinary and of such unusual occurrence in that vicinity that they could not have been anticipated by persons of ordinary experience and prudence. Indeed, if the flood in question be not of this character, it would be difficult to imagine a case where the doctrine of extraordinary floods would apply. It being conclusively established that the flood was of such unusual occurrence that it could not have been anticipated by persons of ordinary experience and prudence, it follows that the trial court should have directed a verdict in favor of the defendant.

No other questions are passed on.

Judgment reversed and cause remanded for proceedings consistent with this opinion.