## EIKLAND et al. v. CASEY et al.*

(Circuit Court of Appeals, Ninth Circuit. July 6, 1920.)

No. 3365.

1. **Waters and water courses ⟨⟩171(2)—One changing course of stream must anticipate floods.**

   The flooding of a stream, although the water rose to an unusual height, even beyond what had been known for many years, cannot be considered an act of God, in a legal sense, where floods of greater or less volume were usual and to be expected, and one changing the course of the stream was bound to anticipate and provide against it.

2. **Waters and water courses ⟨⟩171(2)—Persons diverting stream liable for flood damage.**

   Defendants, who changed the channel of a stream, making a new channel, of smaller capacity than the natural channel, which passed around plaintiffs' lot, *held* liable for the washing away of the lot by a flood caused by heavy rains, which were not unprecedented nor unusual, except in the volume of water falling.

   Wolverton, District Judge, dissenting.

In Error to the District Court of the United States for the First Division of the District of Alaska; Robert W. Jennings, Judge.

Action at law by A. Eikland and another against W. W. Casey and others. Judgment for defendants, and plaintiffs bring error. Reversed.

Action to recover damages for causing destruction of plaintiffs' property by flood waters. The defendants Casey and others, owners of land bordering upon Gastineau Channel at the mouth of Gold creek, in 1913 sold to the plaintiffs a lot. Gold creek flows from the mountain range east of Juneau. in part through a canyon, out of which it flows near the boundary of the Casey-Shattuck land, and thence across such land into Gastineau Channel. Plaintiffs' lot was on the south side of the stream, and from the point where the stream emerges from the canyon to a point some distance below plaintiffs' lot the creek was confined by high banks, but a short distance below plaintiffs' lot the creek at times overflowed the banks, and spread over parts of the Casey-Shattuck lands, and allowed a free outlet of the waters to the channel.

After the plaintiffs had built a house and improved their property, defendants built a dam or bulkhead across the creek at a point approximately opposite the plaintiffs' lot, and from the dam, and from a point opposite and across the stream, constructed bulkheads of logs and stone to Gastineau Channel at a point to the southeast, thus changing the course of the stream, and deflecting it to the southeast in a curve around the west and south sides of plaintiffs' lots. It was alleged that the new channel thus constructed was sufficient to carry the water away at ordinary stages of the stream, but was wholly insufficient at times of flood, such as ordinarily occurred at times of heavy rains, so that the stream as dammed and changed in its course became a danger to plaintiffs' property of which defendants were fully advised. It was also averred that on September 26, 1918, there occurred one of the usual periodical heavy rains to which the vicinity was subject, and which caused the water of Gold creek to rise and pour out of the canyon onto the Casey-Shattuck lands, and that the waters, unable to flow across the flat in their usual and natural course, because of the dam, and being deflected thereby, and the new channel being insufficient to confine and carry off the water, the flood water was deflected, and impinged against plaintiffs' prop-

---

erty, and washed it away, and washed the earth and soil upon the lot itself, so that a new and deep channel thereafter occupied the space formerly occupied by the lot and house; that the damage and destruction was caused solely by the construction of the dam and bulkheads.

The answer affirmatively pleaded that the flood and rains of September 26th were unprecedented and extraordinary, and such as could not have been foreseen by the defendants or any one else, and that the damage was due solely to an act of God. Issue was taken with these affirmative allegations. The case was tried to a jury, and verdict rendered for defendants.

The evidence showed that the defendants constructed bulkheads across Gold creek, and thus dammed the same and diverted it from its natural bed, and forced it into an artificial channel, that the original natural channel before diversion had a relative capacity larger than that of the artificial channel, and that the original channel on a cross-section measurement had an area of 230 square feet, while the new channel on a cross-section measurement had but 150 square feet.

J. H. Cobb and John Rustgard, both of Juneau, Alaska, for plaintiffs in error.

H. L. Faulkner, of Juneau, Alaska, and Myrick & Deering and James Walter Scott, all of San Francisco, Cal., for defendants in error.

Before GILBERT and HUNT, Circuit Judges,. and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The plaintiffs were in possession of property which was protected against freshets by the natural channel of a stream sufficient to carry all flood waters. The defendants, for their own benefit, closed the channel and made a new one, against the plaintiffs' protest that the change would endanger their property. The plaintiffs requested an instruction to the jury that if they found that, if the artificial channel had been built of a capacity equal to the natural channel, the plaintiffs' property would not have been damaged by the flood, then the defendants were liable. Such an instruction would have been justified under the doctrine of the leading case of Rylands v. Fletcher, L. R. 3 H. L. 330, and other English cases cited by the plaintiffs, such as Greenock Corporation v. Caledonian R. Co., [1917] A. C. 556, in which the Lord Chancellor said:

"It is the duty of any one who interferes with the course of a stream to see that the works which he substitutes for the channel provided by nature are adequate to carry off the water brought down even by an extraordinary rainfall, and if damage results from the deficiency of the substitute which he has provided for the natural channel, he will be liable."

In 2 Farnham on Waters and Water Rights, 1634, 1635, it is said:

"The channel in which a stream flows is a component part of the stream itself, and one owner cannot change the flow of the water to another channel to the injury of a lower proprietor without being liable for the injury. * * * One who undertakes to change the channel of a stream must see that the capacity of the new channel is in all respects equal to the old one, and he will be liable for injuries caused by the overflow of the stream in case it is not so; and the fact that the size is greater than that of the old channel will not relieve him from liability if it is constructed in such a manner as to be more likely to overflow"—citing Fletcher v. Smith, L. R. 2 App. Cas. 781.

To the same text may be cited McLean v. Crosson, 33 U. C. Q. B. 448. This inherently just and equitable doctrine of the English courts has been accepted in a few of the courts of the United States, as in Shipley v. Associates, 106 Mass. 194, 8 Am. Rep. 318, Wilson v. New Bedford, 108 Mass. 261, 11 Am. Rep. 352; Cohill v. Esatman, 18 Minn. 324 (Gil. 292), 10 Am. Rep. 184, and Knapheide v. Eastman, 20 Minn. 478 (Gil. 432), and no reason is suggested why it should not be applied to the present case except the reason—if it be a reason—that it is opposed to the decided weight of American authority.

[1, 2] But if that reason is controlling, and we are required to follow the rule generally accepted in the United States, that one who in changing the natural channel of a stream exercises reasonable precaution against floods which may be expected is not responsible for damages thereby occasioned, there still remains the fact that there is no evidence in the present case that the flood of September 26, 1918, was of such a character that it should not have been anticipated in the exercise of reasonable care and prudence. The defendant Casey admitted that before the cribbing was put in on the banks of the creek he knew that at times of very high water the water would flow over the banks at any place. The defendants called three witnesses, who testified as to their observation of floods in the stream during the last 10, 11, and 15 years, and their testimony covering as it does so short a period of time may be held negligible. The defendants also called witnesses who had observed the stream for longer periods. Coggins, who had lived in Juneau 23 years when asked whether he had ever seen freshets as high as that of 1918 answered, "I could not say whether I did or not." He testified, further, that he had seen other freshets and could not say whether they were as high as that of 1918. "They might have been higher for all that I know." Layton was asked whether within his memory of 30 years he had seen as great a rainfall, or as high water as on September 26, 1918. He answered, "No, I don't think so." Behrens, who had been 32 years at Juneau, said that he thought the flood was the highest he had ever seen, but he would not undertake to say positively that it was. The defendants are bound by this testimony, which they themselves introduced. It is wholly insufficient to show that the flood was of an extent and character which the defendants were not bound to anticipate. The plaintiffs excepted to the instructions of the court upon the question of an ordinary flood as not being sufficient under the testimony in the case. We think that the exception was well taken.

"An ordinary flood is one, the repetition of which, though at uncertain intervals, might, by the exercise of ordinary diligence in investigating the character and habits of the stream in which it occurs, reasonably have been anticipated. An extraordinary flood is one of those unexplainable visitations whose comings are not foreshadowed by the usual course of nature, and whose magnitude and destructiveness could not have been anticipated or provided against by the exercise of ordinary foresight." 13 Am. & Eng. Ency. of Law (2d Ed.) 687.

The flood in the present case was not an "unexplainable visitation." It was caused by no cloudburst or other catastrophic phenomenon,

so as to be classed as an act of God.    It was caused solely by a heavy downfall of rain at a time when heavy rains were to be expected. In Ohio, etc., R. Co. v. Ramey, 139 Ill. 9, 28 N. E. 1087, 32 Am. St. Rep. 176, it was said:

"The principle, clearly, is that, although a rainfall may be more than ordinary, yet if it be such as has occasionally occurred, and it may be at irregular intervals, it is to be foreseen that it will occur again, and it is the duty of those changing or restraining the flow of water to provide against the consequences that will result from it. It is within the knowledge of all who have long resided in this state that our streams are occasionally subject, after intervals which are sometimes of shorter and at other times of longer duration, to great floods, occasioned by very heavy rainfalls, and their 'heights are known by those who have felt interested in them. Such rainfalls were not usual and ordinary, but they were unusual and beyond ordinary; i. e., they were extraordinary, and yet it is just as certain that like rainfalls will occur in the future as it is that the same laws of nature by which they are produced, and the same conditions to be affected by those laws, will continue to exist in the future as they have in the past."

It was there held that a cloudburst which had at irregular and infrequent intervals occurred within the memory of man in a particular locality was not to be classed as a vis·major.    So in Gulf, etc., R. Co. v. Pomeroy, 67 Tex. 498, 3 S. W. 722, the court held that, if extraordinary inundations had occurred within the memory of men then living, their recurrence should be anticipated and provision made against the danger likely to result therefrom should a recurrence of the flood take place.    In Gulf Red Cedar Co. v. Walker, 132 Ala. 553, 31 South. 374, the court said:

"The term 'act of God,' in its legal sense, applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them."

In Realty Co. v. Railroad, 154 Mo. App. 364, 134 S. W. 1034, it was said:

That "the history of the country as to" floods should "be taken into consideration," and where similar "extraordinary inundations have occurred within the memory of men then living, their recurrence should be anticipated and provided against."

In Hartshorn v. Chaddock, 135 N. Y. 116, 31 N. E. 997, 17 L. R.·A. 426, the court said:

"Irrespective of any question of negligence or malice, a riparian owner who by his willful act diverts the waters of a natural stream from its accustomed channel, and causes them to flow upon the lands of his neighbor, is liable for the resulting damages."

Answering the contention that the flood in question "was so extraordinary and unusual as to be deemed an act of God," the court said:

"It is found that, though the freshet was unusual, with respect to the volume of water, yet that similar ones, but of less power, have occurred in the past, and are liable to occur in the future from heavy rains or melting of snow."

In Mundy v. New York, etc., R. Co., 75 Hun, 479, 27 N. Y. Supp. 469, it appeared that a flood which occurred in 1889 was unusual in respect to the volume of water, yet that similar floods, but of less

power, had occurred in 1833 and 1865, and that the river had for many years been subject to sudden variations and heavy rises. It was held that the flood of 1889 was not so extraordinary as to relieve the defendant from liability.

The judgment is reversed, and the cause is remanded for a new trial.

WOLVERTON, District Judge (dissenting). After a very careful study of the present controversy, I am not persuaded that the rule which requires a person owning land, and having occasion to change the channel of a stream running through it for the purpose of reclamation or improvement for his benefit, under all circumstances, in order to protect his neighbor against injury, to construct a channel of equal capacity with the old or natural channel, is the better one. The rule in this country would seem to be to the contrary by an overwhelming weight of judicial utterance.

I conceive the law to be that one desiring to change the channel of a stream, which he deems necessary in order to reap the greatest benefit to himself from his own holdings, must, for the protection of his neighbor, take care that the new channel is constructed in such a way, and of such ample capacity, that it will not impede the usual flow of the water in the stream, nor the ordinary flood waters, such as might be reasonably expected or anticipated by the exercise of common prudence and foresight, taking into consideration the known climatic conditions, the topography of the country, and the experience of persons long resident within the locality. He is not required to anticipate unusual and extraordinary or unprecedented floods, such as are produced by the overwhelming cataclysms of nature, although they may not, in a strict sense, be classified as vis major or the acts of God. The trial court's definition of an extraordinary flood is apt, namely, that it "is one of those unexpected visitations whose comings are not foreshadowed by the usual course of nature, and whose magnitude and destructiveness could not have been anticipated or provided against by the exercise of ordinary foresight."

Generally speaking, no person is bound to foresee and provide against casualties never before known and not reasonably to be expected, or which would not have arisen save under circumstances which are exceptional. 29 Cyc. 433. But, coming more nearly to the question in hand, and speaking under the subject "act of God," this expression is found in the same work:

"Thus it has been decided that winds of unusual and extraordinary violence, extraordinary rainstorms, floods, fires, and frosts are classed as acts of God within the rule exempting defendant from liability." 29 Cyc. 441.

The rule is thus epitomized as applied in L. & N. R. Co. v. Conn, 166 Ky. 327, 332, 179 S. W. 195, 198:

"He is not liable for damages growing out of overflows which were caused by extraordinary rains or floods; i. e., such floods or rains as are of such unusual occurrence in the vicinity that they could not have been anticipated by persons of ordinary experience and prudence."

So, in Lyon v. Chicago, M. & St. P. Ry. Co., 45 Mont. 33, 42, 121 Pac. 886, 888:

"The rule of law in such cases is that the defendant is only required to take precautions against ordinary storms which occur in the vicinity; and if the damage would have occurred by the act of God, notwithstanding the obstruction, even if there were negligence on the part of the defendant, damages cannot be recovered. * * * In this case, unlike most cases in which the act of God is invoked as a defense, the act of negligence did not occur during the storm, or after it was over. Therefore the act is only made a negligent act by comparison with the duty which defendant owed before the storm. It was not defendant's duty to foresee and prepare against an unprecedented storm; in other words, it was not defendant's duty to prepare against 'the act of God.' Its duty was only to prepare against ordinary storms."

See, also, Farnham on Waters and Water Rights, vol. 3, sec. 990, where the author says:

"But in making improvements upon his own property a landowner is under no obligation to anticipate or provide against extraordinary floods. * * * But a flood is an act of God when caused, without the negligence of man, by an extraordinary rainstorm so great that it could not reasonably have been anticipated, although if it had been anticipated the effect might have been prevented. A storm is not shown to have been extraordinary, so as to constitute an act of God, by the fact that a similar one had not occurred during a period of six years. If the flood is extraordinary, one whose structures, which were carefully constructed with due regard to the rights of his neighbors, aided in the injury, is not liable for the result."

"Floods unprecedented and so extraordinary as to have been beyond reasonable anticipation are not to be provided against." Atchison, T. & S. F. Ry. Co. v. Herman, 74 Kan. 77, 79, 85 Pac. 817, 818.

So of a large number of cases, comprising many states in the Union, of which I cite only a few: B. & O. R. Co. v. Sulphur Spring School District, 96 Pa. 65, 42 Am. Rep. 529; Karchner v. Penn. R. Co., 218 Pa. 309, 67 Atl. 644; Goddard v. C., B. & Q. R. Co., 143 Wis. 169, 126 N. W. 666; White River Log, etc., Co. v. Nelson, 45 Mich. 578, 8 N. W. 587, 909; Inhabitants of Palmyra v. Waverly Woolen Co., 99 Me. 134, 58 Atl. 674; Dahlgren v. Chicago, M. & P. S. Ry. Co., 85 Wash. 395, 148 Pac. 567; Smith v. C., B. & Q. R. Co., 81 Neb. 186, 115 N. W. 755; Crawford v. Rambo, 44 Ohio St. 279, 7 N. E. 429; O. & M. Ry. Co. v. Thillman, 143 Ill. 127, 32 N. E. 529, 36 Am. St. Rep. 359; Price v. Oregon Railroad Co., 47 Or. 350, 83 Pac. 843.

The necessity of the utilization of water courses in this country is so diverse, for the promotion of so vast a number of enterprises, that I am impressed that an application of the English doctrine, virtually making the party seeking to change or utilize a public stream, for his own benefit, an insurer of his neighbor against injury, is not so well calculated to meet the ends of justice to all as the American doctrine.

As to the usual or unusual features of the flood, it must be conceded that, if the conditions pertaining to whether the flood was an ordinary one, or an extraordinary or unprecedented one, were such that reasonable minds might conscientiously differ, the question was for the jury, and not for the court. Supplementing what is set forth in the prevailing opinion touching the flood waters having a tendency to show their proportions, the witness Summers, who was in charge of the local office of the Weather Bureau at Juneau, testified that the precipitation in 24 hours, on September 25–26, was 5.54 inches, and that at another

period, in October, 1913, when the water was accounted high, the precipitation was 3.50 inches, and that he had no records showing that the rainfall exceeded that in the meantime. Witness further testified that the precipitation at the Perseverance mine, in the Gold creek basin above, spoken of as the Jualpa basin, for the 24 hours ending at 4 p. m. on September 26th, was 7.40 inches, practically 2 inches more precipitation than at Juneau.

Mr. Sharick, who had been a resident of Juneau since 1898, and kept a record of the rainfall from 1898 to 1912, testified that the highest precipitation was on September 7, 1902, 4.01 inches, the next highest on October 17, 1905, 3.50 inches, and the next highest to that on August 26, 1905, 2.17 inches. Mr. Gastonguay relates that the highest precipitation at Perseverance mine since October, 1916, was on September 26, 1918, 7.04 inches. The next highest, according to his record, was on May 28 preceding, 3.4 inches.

Mr. Canfield, an engineer of the United States Geological Survey, who kept a gaging station in Gold creek, near Juneau, from July 20, 1916, testified that the highest point of the water was the stage indicated by 6.81 feet, with a corresponding flow of 2,600 cubic feet per second, on September 26, 1918, and that the highest number of cubic feet prior to that date was 1,000, on August 19, 1917.

W. W. Casey testified that he had been a resident in Juneau since 1898, and that he had seen no such water as fell on September 26, 1918. He further testified that at that time a flume in the basin was carried down, and that the bridge across Gold creek was carried away. The bridge was built in 1914, and took the place of an old one, which was there when witness came to Juneau in 1898, and remained intact from floods during the entire time. The new bridge was constructed some 4 or 5 feet higher than the old one, which was torn down to make place for it.

The very action of the flood in question has a tendency to show it to have been extraordinary and unprecedented. It completely washed away upland, lying 21 feet above the level of the channel of Gold creek, which was covered in part with stumps, and had never, so far as known, been so affected with floods before.

Considering all these things, I am impressed that the question whether the flood was an ordinary one, or was unusual and extraordinary or unprecedented, was one for the jury, and was properly submitted to them for their judgment.

Further than this, a careful examination of the record does not, to my mind, disclose any reversible error of the court.

These considerations would lead to an affirmance of the judgment.