[File No. 7102]

J. J. FERDERER, Respondent, v. NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Appellant.

(42 NW2d 217)

Opinion filed April 6, 1950

*E. T. Conmy* and *E. T. Conmy, Jr.,* for appellant.

*Murray & Murray,* for respondent.

NUESSLE, Ch. J. This action was brought by the plaintiff to recover damages from the defendant Railway Company on account of negligence on the part of the defendant in the damming and diversion of the Cannonball River and in the construction and maintenance of the diversion channel, dikes, and embankments erected and used in such damming and diversion.

The case was tried to a jury. The jury was directed to answer a special interrogatory and to return a general verdict. The interrogatory was answered in the negative and a verdict not inconsistent with it was returned for the plaintiff. Judgment was entered on the verdict. The defendant having laid a foundation therefor moved for judgment notwithstanding the verdict. The motion was denied, whereupon the defendant perfected the instant appeal from the judgment.

The record discloses the following facts: In March, 1943, plaintiff was a tenant in possession of a farm in the valley of the Cannonball River, a tributary of the Missouri. He lived there with his family. The valley, of varying width, descends from west to east through a rough terrain. The channel of the river is tortuous. To the northwest of the plaintiff's farm it curves to the south, thence easterly through the farm south of his buildings, thence north again east of the buildings, thus forming a loop. In 1909 the defendant built a line of railroad up the valley. The grade for the roadbed was raised above the valley floor about four feet. It crossed the Cannonball northeast of the plaintiff's buildings and passing about 1,000 feet north of the buildings again crossed the river northwest of them. Both of these crossings were overfills in the channel. Therefore, it became necessary to change the course of the river. Accordingly, the defendant cut a new channel north of and parallel with its roadbed across the peninsula formed by the loop. To divert the stream into the channel thus cut an earthen dam was constructed 200 feet north of the west crossing of the river. About 200 feet west of this crossing there was a depression or draw parallel with the channel. The grade was built through and over this draw and two cement culverts each 36 inches in diameter were laid under the grade to take care of such water as might run down the draw from the north. Likewise, under the fill in the channel on the east side of the loop two cement culverts each 30 inches in diameter were laid to convey back into the stream such water as might accumulate in the abandoned portion of the channel. Thus under the same head of water the 36 inch culverts had more than two-fifths greater capacity than the 30 inch. The diversion channel was 75 feet wide at the bottom and ten feet in

depth with a uniform grade down from west to east. It was straight and approximately 4200 feet long. What was done with the earth that was excavated does not appear. The length of the original abandoned channel forming the loop was approximately 7800 feet. The dam across the river at the point of diversion was substantially built according to proper engineering standards. It was riprapped on its upstream side and a roadway passed over it.

In February, 1943, the weather turned warm. The snow melted and the Cannonball ran bank full. Then abruptly the temperature fell and the river froze over. With the cold weather the flow decreased and ice ten to fourteen inches thick was left in the riverbed and hanging on the banks. On March 14, a storm began. This lasted for nearly four days, with high winds and a heavy fall of wet snow that drifted greatly. On March 22, the temperature rose and the snow melted rapidly. All the streams were in flood. On the 25th the river was running more than bank full. An ice gorge formed a mile and a quarter below the plaintiff's farm. The water backed up in the valley immediately above the gorge so that it was nearly a mile in width. Upstream from the diversion dam and railway embankment the valley was flooded and became an ice-filled lake several hundred acres in extent. Water poured through the culverts west of the dam. Water also flowed in through ravines from the south. Thus the land within the loop flooded. It rose so high that it submerged the plaintiff's barnyard.

On the morning of the 25th, Carl Haff, one of the plaintiff's neighbors, came to the bank across the river south of the buildings. The plaintiff was away but his wife and children were at home. Haff shouted to the family that the situation was dangerous and that they should leave. At that time the water had not reached the house but the barnyard was submerged and he could see cattle standing in the water with only their heads visible. That afternoon the family walked from the house to the railroad track, thence along the track to the east side of the loop. There they were met by Haff who took them to his home where they remained that night. The next morning they returned to the farm walking in on the track. In the afternoon

174

Haff and several neighbors again came. They drove in with a team of horses pulling a trailer on the track from the east side of the loop to a point north of the buildings, and then on some high ground to the buildings. They found that some of the plaintiff's cattle and hogs, and the poultry, in the barnyard were drowned. They removed those that were still alive. Some they transported in the trailer, others they drove out. They also took the family out.

At some time during the night of the 26th the railroad grade west of the dam was washed out as was the fill in the channel there and the west one-half or two-thirds of the diversion dam. The fill in the channel on the east side of the loop also was washed out, together with 320 feet of the railroad grade. And the water had risen so high that it reached and flooded the plaintiff's house. The facts set forth above are undisputed.

The defendant called as witnesses the section foreman and several members of his crew whose duty it was to patrol and look after that portion of its roadbed and track with which we are here concerned. These witnesses testified that on the morning of March 25th they patrolled the track as usual. At that time the water west of the loop and north of the track was nearly up to the top of the grade. It was spouting through the 36 inch culverts under such pressure that it kicked the water below back some 20 to 40 feet. Some of these witnesses also testified that the water was spouting through the 30 inch culverts under the fill on the east side of the loop in the same manner. There is no direct denial of this latter testimony. These witnesses testified that the water was higher on the north side of the track than it was on the south side, but it does not appear whether this was the case only on the west side of the loop or at any or all other points along the diversion channel. On the other hand, the defendant's witness, Haff, testified that on the afternoon of the 25th at the east crossing of the river the water was a foot higher south of the track than it was north of the track and that on the 26th it was two feet higher south than it was north of the track. Manifestly, if Haff was right, the water could not have been spouting through the culverts there. On the morning of the 26th the section crew again patrolled the track and at that time

found that the water west of the loop was five feet higher on the north than on the south side and was creeping between the ties over the grade west of the dam but that the dam, the fill, and the grade were still intact.

Defendant's division engineer testified that about two months after the flood he, with a number of assistants, surveyors, and others, using instruments made measurements of the diversion channel and of that portion of the abandoned channel south of the railroad track. His testimony is that the narrowest part of the abandoned channel was 70 feet wide and 10 feet deep and that the diversion channel was straight, 10 feet deep and 75 feet wide, with a uniform grade down from west to east. There is no testimony, however, as to the grade of the latter or as to the difference in elevation, though it must have been appreciable, between the bottom of the diversion channel at the point of diversion and the bottom of that channel where it joined the original channel on the east. Neither does it appear whether the bottom of the diversion channel at the points of its beginning and ending was of the same elevation as the bottom of the original channel of the river at those points. The elevation of the top of the fill over the channel on the west side of the loop was not shown, nor was that of the top of the fill over the channel on the east side of the loop.

The plaintiff testified that the diversion channel was 70 feet wide and 10 feet deep and that the abandoned channel was 350 feet in width from top bank to top bank. But it is uncertain as to what he meant by "top bank to top bank". His son-in-law was also called as a witness for the plaintiff. His testimony was in accord with that of the plaintiff as to the width of the abandoned channel but not as to the width or depth of the diversion channel in that he said it was 15 feet wide and 8 feet deep. Neither of these witnesses had ever measured either of the channels and gave only their estimates as to the widths and depths thereof. Both of them testified that the culverts on both sides of the loop were filled with dirt and debris in the fall and winter of 1942-43. This was denied by the foreman and other members of the section crew.

The defendant's engineer further testified that using instru-

ments to determine the height of the flood from marks and scars on the trees and from water marks and debris on the banks the water on the south side of the loop had been some nine inches higher than it was across the channel on the north side and that on the west side of the loop the water had been over three feet higher than on the south side. Whether he meant east side or south side is not made clear.

There is no evidence in the record showing the width of the valley at either end of the loop or as to the extent or elevation of the flood plain—that is the part of the floor of the valley subject to overflow in times of ordinary flood—nor does it appear how wide the valley was, measured from north to south across the portion occupied by the plaintiff's buildings. Nor are there any profiles in evidence showing the relative elevations of the bed of the river; the artificial channel; the dam; the railroad grade; or of the floor of the valley. It is undisputed, however, that the plaintiff's barn was about 200 feet north of the abandoned channel and that the house and other buildings were on somewhat higher ground about 200 feet further from the channel. The elevation of the barn and other buildings above the bed of the channel is not shown. Neither does it appear whether there *was* a series of rises from the north bank of the original channel to the high ground north of the diversion channel or whether there was a general uniform slope. Nor does it appear how far it was from the diversion channel to the north side of the valley.

Numerous witnesses were called by the defendant who testified as to the character and severity of the storm which began on March 14, and to the extent of the flood that followed after the snow had melted. These witnesses testified that never before had they seen so great a flood. Some had lived near and observed the river thereabouts for 40 years or more. One of them testified that there had been other floods but the water in the instant flood was two to four feet higher than any other he had known of. The foundation under his house had been undermined by this flood—something that had never before happened. Whether this was before or after the 26th does not appear. He lived down the valley from the plaintiff. Another of the de-

fendant's witnesses testified that he owned land up the valley just above the track west of the diversion dam and that the instant flood had inundated several hundred acres there belonging to him and the marks on the trees indicated the water had been ten or twelve feet higher than ever before.

There is no question but that the plaintiff suffered serious damage by reason of the flood. The greater part of this damage was incurred prior to March 26th and before the grade, the fills, and a portion of the diversion dam were washed away. The damage incurred after the 26th was relatively small.

The allegations of the plaintiff's complaint on which he predicates his claim of negligence are to say the least, nebulous and most inartificially drawn. In paragraph three thereof he alleges: ". . . that prior to the construction of said railroad, the natural course of the Cannon Ball River on said land and adjacent thereto, was a loop to the south; that the said defendant in its construction of its said road changed the course of said Cannon Ball River by shutting off the flow of the waters of the Cannon Ball River in said loop to the south and digging a new ditch and causing said River to flow north of its said railroad, thereby causing the Cannon Ball River to continue to flow north of the railroad instead of going under the road and going into said loop and going under the road again where said loop turns to the north under said railroad; that the defendant in the construction of the new course of the Cannon Ball River as aforesaid, and in preventing the waters to follow its natural course around said loop did negligently and carelessly construct the same, among other things in this: that in the first place the defendant should not have changed the course of said Cannon Ball River; that it should have permitted said Cannon Ball River to flow in its natural course; Second, that in its attempt to blockade the flow of the waters of the Cannon Ball River in its natural course through said loop as aforementioned the defendant did the work in a careless and negligent manner; that it constructed and maintained an inadequate levee and dam across said Cannon Ball River at both places where the natural bed stream goes under the railroad tracks at said place through

said loop as aforementioned; that said levee and dam was not long enough nor high enough, neither was it constructed of adequate material, nor was it wide enough; neither did it have the proper foundations; that such is true with reference to both levee and dam at both ends of said loop where the river bed goes under the railroad in going through the loop and comes out the loop; that the defendant negligently and carelessly constructed and built the new bed of the Cannon Ball River north of said railroad in and adjacent to said land; that at the time it dug and constructed said river bed, it did not dig the ditches deep enough or wide enough to take the normal flow of water; that it carelessly and negligently maintained same; that among other things, it permitted its banks to cave in to the bottom of the artificial bed and permitted silt of the river bed to fill up said ditch; that such negligent construction of said new river bed and blockading the waters from its natural flow as aforementioned did at all times place the surrounding land, including the above described land, in great jeopardy and peril from being flooded with waters from the Cannon Ball River."

And in paragraph four he further alleges: "That on or about the 26th day of March, 1943, the River in said artificial river bed, so constructed by the defendant as aforesaid, plugged up and that said defective levee and dam in the west end of said loop as aforementioned, gave away thereby permitting the waters of the Cannon Ball River to flow in a torrent flood through the old river bed and up against the levee built by the defendant across the east end of the loop as aforementioned, which caused the waters of the Cannon Ball River to rise and flood the plaintiff's premises with approximately twelve (12) feet of water, or more, . . . that in addition thereto, the defendant carelessly and negligently did permit said dam and levee on the west end of said loop to become deteriorated and defective and failed to properly maintain and keep same up; that the defendant carelessly and negligently permitted said artificial river bed to become defective; that the defendant's carelessness and negligence as aforesaid continued up to the time of said flood aforementioned;

that by reason of the foregoing premises, the plaintiff has suffered damages . . . ."

The defendant answering denied any negligence and alleged that the channel diversion, dikes, and embankments, were designed and constructed pursuant to proper engineering standards to take care of all normal waters and all flood waters reasonably foreseeable; that such channel, dikes, and embankments were properly cared for and maintained and had carried off all the waters of the river for a period of over 30 years; that the flood was unprecedented and unforeseeable; that the waters did not reach greater heights than they would have reached had the river remained in its natural state and regardless of the channel change the same flood and damage would have occurred.

The defendant predicates this appeal on the grounds that the evidence is not sufficient either to warrant the answer returned to the special interrogatory or to support the verdict; that the court erred in denying defendant's motions for directed verdict and for judgment notwithstanding the verdict, and in numerous rulings on matters of law during the course of the trial; that the court erred in his instructions to the jury; and that counsel for the plaintiff resorted to improper and prejudicial practices during the trial of the case and in argument to the jury.

There is no question but that the plaintiff suffered serious damage by reason of the high waters in the Cannonball on March 25th and 26th, 1943. The vital question of fact is as to whether this damage was incurred as a proximate effect of negligence on the part of the defendant in the construction and maintenance of the diversion channel and of the dikes, and embankments on which its track was laid. The defendant's contentions as to that question are, as stated in its motions for directed verdict and for judgment notwithstanding the verdict, that "There is no testimony showing any negligence on the part of the defendant proximately causing the plaintiff's loss; secondly, the undisputed testimony shows that regardless of the channel change the same flooding and damage would have occurred; third, the undisputed testimony shows that the flood here involved was of such unprecedented occurrence that it could not have been foreseen by men of ordinary experience and prudence."

The Cannonball River was non-navigable. The defendant had bought and owned the land on which the artificial channel, the dikes and embankments were constructed. It had the right to dam and divert the river. Bigelow v. Draper, 6 ND 152, 69 NW 570, 56 Am Jur 504. But in doing so it was bound to see to it that no injury should result therefrom and in that behalf to make such provisions as were necessary to take care of, not only the normal flow of the river, but also of any flood that men of ordinary experience and prudence could have foreseen. Eikland v. Casey, 9 CCA, 266 Fed 821, 12 ALR 179 and note; Willson v. Boise City, 20 Idaho 133, 117 Pac 115, 36 LRA (NS) 1158; Garrett v. Beers, 97 Kan 255, 155 Pac 2, LRA 1916F, 1289; Anderson v. Rucker Bros., 107 Wash 595, 183 Pac 70, 8 ALR 544; 67 CJ 706 et seq.; 56 Am Jur 505 et seq. And this duty was a continuing one. State ex rel. Trimble v. Minneapolis etc. Ry. Co., 28 ND 621, 150 NW 463; Soules v. Northern Pac. Ry. Co., 34 ND 7, 157 NW 823, LRA1917A, 501; Missouri etc. Ry. Co. v. Nichols, 170 Ark 1194, 279 SW 354; Schwank v. Platte County, 152 Neb 273, 40 NW2d 863; 67 CJ 706 et seq., and cases cited.

When the case was submitted the court at the request of the defendant directed the jury in addition to returning a general verdict to answer the special interrogatory: "Was the flood that occurred on or about March 26th, 1943, in the valley of the Cannon Ball River in the vicinity of and on the land occupied by the plaintiff an extraordinary and unprecedented flood?"

In Soules v. Northern Pacific Railway Company, supra, this court held as stated in the syllabus, that "Extraordinary or unprecedented floods are floods which are of such unusual occurrence that they could not have been foreseen by men of ordinary experience and prudence." And the court in its instructions to the jury in the instant case so charged.

The defendant herein contends that it did so construct the diversion dam, channel, and other works as to take care of the normal flow of the river and of any ordinary flood, and that the flood here under consideration was so extraordinary and unprecedented, that it could not have been anticipated and on this account alone the damage resulted. Relying on this as a de-

fense the burden under the facts as shown was on the defendant to establish it by evidence satisfactory to the jury. Soules v. Northern Pacific Ry. Co., supra; Reichert v. Northern Pacific Ry. Co., 39 ND 114, 167 NW 127, 129; Southern Railway Co. v. Neal, 146 Va 229, 135 SE 703; 67 CJ 709. Thus viewing the evidence can it be said that the defendant has sustained that burden? And in this connection it must be borne in mind that the jury having answered the special interrogatory and returned a verdict not inconsistent with that answer favorable to the plaintiff all reasonable intendments insofar as the evidence is concerned must be resolved in his favor. Schnoor v. Meinecke, ante 96, 40 NW2d 803; Bormann v. Beckman, 73 ND 720, 19 NW 2d 455.

The undisputed testimony is that the waters of this flood were greater in volume and rose higher than in any that had ever before occurred within the recollection or knowledge of any of the witnesses, some of whom had lived in the vicinity and had observed and known the Cannonball River for 40 or more years. And the published report of the United States Weather Bureau offered by the defendant and received in evidence tends to corroborate this testimony. But this report also shows that floods on the Cannonball and other streams tributary to the Missouri River in this area were not unusual, particularly at the time of the spring run-off, and ice jams or gorges were often formed. And one of the defendant's witnesses testified that a few years prior to the instant flood there was another almost as great as this one.

In passing upon the question of whether a flood is extraordinary and unprecedented it is proper and necessary to consider the topography of the area traversed and drained by the flooded stream; the climatic conditions ordinarily prevailing there; whether the stream is subject to ice jams during the spring run-off; the character of tributary streams as to their volume and velocity; the laws of hydraulics known to the ordinary man; the extent of the drainage area; the existence or non-existence of conditions tending to retard the flow of the water therein; and whether there have been other floods and the frequency and magnitude thereof. If all the attendant conditions and circum-

stances are such that men of ordinary experience and prudence reasonably could have foreseen that a flood such as did occur might occur, it would not be extraordinary and unprecedented within the meaning of those terms as they were defined in the instructions to the jury. The question is one of fact, to be determined as any other question of fact. In the instant case the evidence is such that reasonable men might differ as to the answer to be made to the special interrogatory. Therefore, we cannot say that the jury's determination was not warranted by the evidence.

It does not follow as a matter of course that because the jury found the flood was not extraordinary and unprecedented on that account alone the defendant is liable for any damage the plaintiff may have suffered. In order that the plaintiff recover it is necessary that the defendant be found to have been negligent and that such negligence was the proximate cause of the damage.

We have set out a lengthy summation of the evidence. The diversion channel was 4200 feet in length. The jury could properly find from the evidence that the difference between the level of the water at the west end of the diversion channel and of the level at the east end was seven feet, and consequently, that the diversion channel was not capable of carrying off the waters of the river at the stage the flood had reached on the 25th and 26th. This finding would amount to a finding of negligence in the construction and maintenance of the diversion channel.

We have quoted the allegations of the plaintiff's complaint on which he predicated his charges of negligence. Considered in the light most favorable to the plaintiff we think that a charge of negligence may be spelled out of these allegations, not only on account of the construction and maintenance of the diversion channel as above set forth, but also on account of the construction and maintenance of the dikes and embankments erected by the defendant.

The proofs disclose that under the fill and embankment at the east crossing of the river there were two cement culverts each 30 inches in diameter and under the fill and embankment where the latter crossed the depression west of the river there were two

cement culverts each 36 inches in diameter. It is true that the complaint makes no mention of any of these culverts and for that reason the defendant objected to the admission of any testimony respecting them. This objection was properly overruled and the testimony was received. The defendant itself must have construed the complaint as charging negligence not only in the construction of the diversion channel, but also in the construction and maintenance of the dikes and embankments. For in its answer defendant alleged that the channel, the dikes, and the embankments were constructed and maintained in a proper manner and that there was no negligence on account of their construction or maintenance. And it made no demand for a bill of particulars. On the trial the defendant itself introduced evidence as to the number of culverts, and as to their size, location and condition. Finally the court in its instructions to the jury charged that the negligence complained of by the plaintiff was on account of the construction and maintenance of an insufficient channel, dam, and embankments.

There is no question but that the abandoned channel and the whole of the valley south of the railroad were filled with water to such an extent that the barnyard of the plaintiff was inundated. There is some evidence that water from melting snow flowed into this valley through ravines from the south. And defendant's witnesses testified that water from the flood plain west of the loop spouted through the 36 inch culverts in tremendous volume. Simple arithmetic demonstrates that the water that poured into the basin through the 36 inch culverts was two-fifths more than the 30 inch culverts down stream under the fill on the east side of the loop would carry. However, it is immaterial whence the water came. The 30 inch culverts, evidently put under the fill for the purpose of draining the basin, were insufficient and the jury on that account was warranted in finding that the defendant was negligent in the construction of the embankment.

Summarized, the evidence warranted the jury in finding: That the defendant built a railroad up the valley. The grade or embankment for the roadbed built four feet above the valley floor, made two crossings of the river overfills in the channel about

4200 feet apart. It laid two 36 inch culverts under the embankment 200 feet west of the upper fill and two 30 inch culverts under the lower fill. To take care of the water that the river in its natural state would have carried, defendant erected a diversion dike or dam in the channel about 200 feet above the upper fill and cut an artificial channel parallel with the roadbed across to the original channel just below the lower fill. All of this was done as one project and undertaking. The diversion channel was incapable of carrying the waters of the stream in ordinary flood time. As a result water accumulated in the flood plain west of the loop above the dike and railway embankment. On account of this accumulation water spouted through the 36 inch culverts. It was augmented by that which came from the melting snow from south of the loop. The 30 inch culverts could not carry away the water thus accumulated. The basin filled. The plaintiff's barnyard was inundated. His livestock and poultry were drowned. His seed and feed were destroyed. His machinery was floated away or was damaged. All of this happened before the flood had reached its crest and before the dam and embankment west of the loop gave way. The total of the loss and damage thus suffered by the plaintiff was greater than the amount of the verdict returned by the jury. The jury also could well find, as in effect it did find, that the water would not have reached the height that it did and effected the damage shown had there been no negligence in the construction and maintenance of the diversion channel and of the dikes and embankments.

The defendant predicates error on certain rulings on matters of evidence. It contends that evidence as to the culverts was inadmissible since it was not responsive to any issue made by the pleadings. What we have already said as to the matter of the culverts disposes of this particular assignment.

Defendant also contends that the court erred in overruling objections to the admission of testimony of the plaintiff's witnesses as to the depth and width of the original channel and of the diversion channel. The reason assigned for the objections was that no foundation had been laid for the admission of this testimony, since the witnesses had made no measurements and could give only their estimates. They, however, testified that

they knew the channels, had often observed them, and that they could estimate their width and depth. Their answers purported to give these estimates. The evidence was admissible. Its weight and worth was for the jury.

Defendant assigns error on account of misconduct of counsel for the plaintiff during the course of the trial. The grounds for this assignment are that in the cross-examination of defendant's witnesses the insinuating character of counsel's questions and his exclamations when the witnesses answered them were intended to and did prejudice the jury. There was ground for defendant's taking exception to the conduct of counsel. But although it was improper we are unable to say that it was so prejudicial as to warrant the granting of a new trial.

In the course of his argument counsel for the plaintiff told the jury that the special interrogatory was submitted to the jury for the purpose of misleading them. Counsel for the defendant objected to this statement and moved for a continuance because of it. The court sustained the objection and stated that the argument was improper. He also admonished the jury to disregard the statement but denied the motion to continue. There was no error in so doing. Thereafter, counsel for the plaintiff commented not only on the facts on which the answer to the interrogatory would be based but also as to the legal effect of that answer, saying that if it were in the affirmative the plaintiff "would be left out in the cold." Defendant objected to this statement insisting that plaintiff had no right to argue as to the effect of the answer and moved that a mistrial be declared and the case continued over.

The function of the jury was to answer the interrogatory according as they might find the facts to be regardless of its effect. Plaintiff concedes that it is reversible error to comment on the effect of their special findings when the jury is required to return a special verdict pursuant to the provisions of Section 28–1502, RC 1943. See Morrison v. Lee, 13 ND 591, 102 NW 223. But he insists that this rule does not apply to special interrogatories submitted pursuant to the provisions of Section 28–1503, RC 1943. This latter section provides that the general verdict which the jury in such case is also required to return must be

consistent with the answer to the special interrogatory and if it is not the answer controls. In such case it is proper for the court to instruct the jury that the general verdict must be consistent with the special finding. See Acton v. Fargo & Moorehead Street Ry. Co., 20 ND 434, 129 NW 225. On the other hand, when the case is submitted for a special verdict under Section 28–1502 no general verdict is returned. While there is this distinction between special interrogatories and special verdicts, nevertheless, it is improper to argue to the jury as to the effect of the answer to a special interrogatory. This is a matter of law with which the jury has no concern. The object of the law providing for the submission of special interrogatories is the same as that for the submission of a case for a special verdict— that is, as said in Morrison v. Lee, supra, "To secure fair and impartial answers to the questions submitted, 'free from bias or prejudice in favor of either party or in favor of a particular result'." In the instant case the defendant moved the court to declare a mistrial and continue the case. The court did not grant this motion. The trial judge heard the argument and was able to observe the effect, if any, upon the jury. Under the circumstances we cannot say there was error in not granting the motion.

Error is also assigned on account of certain portions of the instructions given by the court. Defendant complains that the court charged the jury that if after considering all of the evidence they should find the defendant was negligent in and about the construction and maintenance of the diversion channel, dikes, and embankments they should return a verdict for the plaintiff but that they were not told in said instruction that before they could so return their verdict they must also find that this negligence was the proximate cause of the damage that resulted. An examination of the whole charge, however, discloses that the court did in two instances elsewhere charge the jury that before they could return a verdict for the plaintiff they must find the negligence of the defendant was the proximate cause of the damage. While these latter portions of the instructions did not immediately follow the portion of which the defendant complains, reading the charge as a whole and considering all

the parts thereof, the jury, as reasonable men, could arrive at no other conclusion than that before they could return a verdict for the plaintiff on account of defendant's negligence they must also find that such negligence was the proximate cause of the damage suffered by the plaintiff. Since this is so, there is no ground for the defendant's contention. See State v. Kerns, 50 ND 927, 198 NW 698, where we held "Though an instruction standing alone may be insufficient or erroneous it must be considered in connection with the remainder of the charge and if the whole charge taken together correctly advises the jury as to the law, the error, if any, is thereby cured." See also McGregor v. Great Northern Railway Co., 31 ND 471, 154 NW 261; Ann Cas 1917E, 141; Soules v. Northern Pacific Railway Co., supra; Munster v. Stoddard, 44 ND 105, 170 NW 871; Ramage v. Trepanier, 69 ND 19, 283 NW 471.

There are other portions of the instructions which the defendant challenges. However, examined in the light of the view we have taken of the instant case they are without merit and deserve no consideration here.

Judgment affirmed.

GRIMSON, CHRISTIANSON and MORRIS, JJ., concur.

BURKE, J. (dissenting). I cannot agree that the evidence in this case is sufficient to sustain a finding by the jury that the flooding of plaintiff's land and the resultant damage were proximately caused by any act or omission on the part of the defendant. On the contrary I am satisfied that the evidence affirmatively demonstrates that plaintiff's land would have been flooded in the spring of 1943, had the defendant never interfered to divert the Cannonball River from a part of its natural course.

As has been stated in the opinion prepared by Chief Justice Nuessle, the defendant had built a railroad grade, east and west, across a loop in the natural course of the Cannonball River and had short-circuited the river by building an artificial channel across the loop north of the railroad grade. Plaintiff's buildings were south of the grade and adjacent to the natural, but no longer used, course of the stream. Two culverts, thirty-six

inches in diameter, were installed in the grade at a point some two hundred feet west of the west end of the loop and two culverts, thirty inches in diameter, were installed in the grade at the bottom of the old channel at the east end of the loop. If I believed that the evidence justified a conclusion that the flooding of plaintiff's land had been caused either by the inadequacy of these culverts or their difference in capacity, I would unhesitatingly agree with the majority in this case.

As I view the record, however, the evidence, most favorable to the plaintiff, will permit no more than a conclusion that the inadequacy of the culverts, at most, augmented the flood upon plaintiff's land to a small degree.

It was established by uncontroverted proof, confirmed by the record of the U. S. Weather Bureau, that the Cannonball River in the latter part of March 1943, reached flood stages higher than in any other years within the recollection of the witnesses. It was also established that the riparian lands along the Cannonball, immediately above and immediately below the plaintiff's land, were flooded to depths never previously attained within the memories of the owners of the lands. If the river had been permitted to run its natural course, the flood waters above plaintiff's land would of necessity have traversed the old channel adjacent to plaintiff's buildings.

For a time the railroad grade partially protected plaintiff's land from these flood waters. His land, however, was gradually flooded on the 25th and 26th of March by water which poured through the culverts at the west end of the railroad grade and according to most witnesses through the culverts at the east end also. One witness, however, whom the jury could have believed, testified that on the afternoon of the 25th of March, the water at the east end of the loop was one foot higher on the south side of the railroad grade than it was on the north side and that on the afternoon of the 26th of March the water was two feet higher on the south side.

It is clear to me, therefore, that even under the testimony most favorable to the plaintiff, the degree of flooding which can be attributed to the inadequacy of the culverts at the east end of the loop is no more than that which would have resulted from the

difference in elevation between the waters on the south and north sides of the grade. This was at most two feet. Since plaintiff's barns were flooded to a depth of ten or twelve feet, it is apparent that the bulk of his damage could not have been caused by inadequate culverts.

It is also clear that plaintiff's damage was not caused by the lack of capacity of the artificial channel through which the river had been diverted. Greater capacity in this channel would have resulted in raising the level of the water on the north side of the culverts. at the east end of the loop, and in blocking to a greater extent the egress of flood waters from plaintiff's land.

I think the judgment of the district court should be reversed.