**Emil FRANK and Elizabeth Frank, Plaintiffs and Respondents,**

v.

**COUNTY OF MERCER, North Dakota, a public corporation, State of North Dakota, acting by and through its North Dakota State Highway Department, Walter Hjelle, State Highway Commissioner, Defendants and Appellants.**

**Civ. No. 8685.**

Supreme Court of North Dakota.

April 22, 1971.

Rehearing Denied May 13, 1971.

Helgi Johanneson, Atty. Gen., Bismarck; Vernon R. Pederson, Special Asst. Atty. Gen., Bismarck; and J. C. Blaisdell, Mercer County State's Atty., Hazen, for defendants and appellants.

James R. Jungroth, Jamestown, and Harvey J. Miller, Dickinson, for plaintiffs and respondents.

PAULSON, Judge.

This appeal is taken by the County of Mercer, North Dakota, a public corporation, and the State of North Dakota, acting by and through its North Dakota State Highway Department, Walter Hjelle, State Highway Commissioner [hereinafter State of North Dakota] from a judgment dated February 11, 1970, awarding Emil and Elizabeth Frank damages as the result of the flooding of the Frank farmstead on June 24, 1966. Trial de novo was demanded. The undisputed facts are that Emil Frank was and is the owner and he and his wife, Elizabeth Frank, were and are the occupants of a farm located about fifteen miles north of Glen Ullin, North Dakota, in section 32, township 142, range 88, in Mercer County. A public highway is located adjacent to the southern border of the Frank farm land and crosses Coyote Creek, which is a natural watercourse running from a southeasterly direction to a northwesterly direction on the west side of the Frank farm. Coyote Creek is the only outlet for the discharge of surface waters from the drainage basin which is located to the south of the Frank farm. The Frank farmstead buildings were situated on an elevation approximately four feet above the eastern bank of Coyote Creek. The above-mentioned highway and bridge were constructed by the State of North Dakota and Mercer County. The bridge and its embankment were constructed in 1963. On June 24, 1966, a rainstorm occurred in this part of North Dakota, including the area drained by Coyote Creek and its tributaries. The waters from this rainstorm subsequently flowed over the Frank farm and caused extensive damages to the farm home and outbuildings, as well as damaging various items of personal property owned by the Franks. As a result, an action for damages was brought against the State of North Dakota and the County of Mercer.

The issues in the case at bar are:

1.  Was the rainstorm which occurred in the Coyote Creek watershed on June 24, 1966, an act of God?

2.  Did the Franks sustain their burden of establishing that the design, engineering, and construction of the bridge and the highway was a proximate cause of the resulting damages?

The relevant North Dakota constitutional provision and statutes are:

N.D.Const. § 14. "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner. No right of way shall be ap-

propriated to the use of any corporation until full compensation therefor be first made in money or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, provided however, that when the state or any of its departments, agencies or political subdivisions seeks to acquire right of way, it may take possession upon making an offer to purchase and by depositing the amount of such offer with the clerk of the district court of the county wherein the right of way is located. The clerk shall immediately notify the owner of such deposit. The owner may thereupon appeal to the court in the manner provided by law, and may have a jury trial, unless a jury be waived, to determine the damages."

§ 24–03–06, N.D.C.C. *"Method of construction of highway ditches.*—Any and all highways of any kind hereafter constructed or reconstructed by the department, any board of county commissioners, any board of township supervisors, their contractors, subcontractors or agents, or by any individual firm or corporation, shall be so designed as to permit the waters running into such ditches to drain into coulees, rivers, and lakes according to the surface and terrain where such highway or highways are constructed in accordance with scientific highway construction and engineering so as to avoid the waters flowing into and accumulating in the ditches to overflow adjacent and adjoining lands. In the construction of highways, as herein provided, the natural flow and drainage of surface waters shall not be obstructed, but such water shall be permitted to follow the natural course according to the surface and terrain of the particular terrain."

§ 32–15–22, N.D.C.C. *"Assessment of damages.*—The jury, or court, or referee, if a jury is waived, must hear such legal testimony as may be offered by any of the parties to the proceedings and thereupon must ascertain and assess:

"1. The value of the property sought to be condemned and all improvements thereon pertaining to the realty and of each and every separate estate or interest therein. If it consists of different parcels, the value of each parcel and each estate and interest therein shall be separately assessed;

"2. If the property sought to be condemned constitutes only a part of a larger parcel, the damages which, will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned and the construction of the improvement in the manner proposed by the plaintiff;

"3. If the property, though no part thereof is taken, will be damaged by the construction of the proposed improvement, the amount of such damages;

"4. If the property is taken or damaged by the state or a public corporation, separately, how much the portion not sought to be condemned and each estate or interest therein will be benefited, if at all, by the construction of the improvement proposed by the plaintiff, and if the benefit shall be equal to the damages assessed under subsections 2 and 3, the owner of the parcel shall be allowed no compensation except the value of the portion taken, but if the benefit shall be less than the damages so assessed the former shall be deducted from the latter and the remainder shall be the only damages allowed in addition to the value of the portion taken;

"5. As far as practicable, compensation must be assessed separately for property actually taken and for damages to that which is not taken."

■ In defining an act of God as being an extraordinary or unprecedented act, this court held, in Soules v. Northern Pac. Ry. Co., 34 N.D. 7, 157 N.W. 823, 824 (1916), in paragraphs 6 and 7 of the syllabus:

"6. Extraordinary or unprecedented floods are floods which are of such unusual occurrence that they could not have been foreseen by men of ordinary experience and prudence. Ordinary floods are those, the occurrence of which may be reasonably anticipated from the general experience of men residing in the region where such floods happen.

"7. In passing upon what is or what is not an extraordinary flood or whether it should have been anticipated and provided against, the question to be decided is: 'Considering the rains of the past, the topographical and climatic conditions of the region and the nature of the drainage basin as to the perviousness of the soil, the presence or absence of trees or herbage which would tend to increase or prevent the rapid running off of the water, would or should a reasonably prudent man have foreseen the danger and provided against it?' "

■ In Reichert v. Northern Pac. Ry. Co., 39 N.D. 114, 167 N.W. 127, 136 (1918), this court held:

"We must, indeed, hold to what we believe to be the prevailing American rule, that the defense in such cases can only be that of vis major, or the act of God, and that the act of God in its legal sense applies only to events in nature so extraordinary that the history of the climatic variations and other conditions in the particular locality affords no reasonable warning of them, and that damages cannot be avoided on the grounds that the flood was an act of God, where, from geographical and climatic conditions, the flood might have been anticipated, though it occurred infrequently."

■ Whether a flood is extraordinary or unprecedented is a question of fact to be determined as any other question of fact and this is the burden of the party asserting. Ferderer v. Northern Pac. Ry. Co., 77 N.D. 169, 42 N.W.2d 216 (1950); Reichert v. Northern Pac. Ry. Co., *supra*; Soules v. Northern Pac. Ry. Co., *supra*. Witnesses who are residents of the watershed area above the Frank property testified to the intensity of the rainstorm on the day of the flood. Their testimony indicated that their rain gauges had registered from 3.50 inches to in excess of 6 inches of rainfall in an approximate 3-hour period. Six of these witnesses testified that they had rain gauges of from 4 to 6-inch capacities and each of these gauges was overflowing after this rain. These residents who testified at the trial stated that they had never seen Coyote Creek flowing higher than it did following the rainstorm in question on June 24, 1966, and they had lived in the area for a maximum period of up to 60 years.

The state climatologist, Ray Jensen, testified as an expert. Mr. Jensen's testimony included an analysis of the recorded chart which measured the intensity of the rainfall on the day of the flood. This chart was the record of an official weather station located in the watershed area of Coyote Creek. Mr. Jensen stated that the chart revealed that a light rain had begun to fall on June 24, 1966, at approximately 7:00 a. m. and had continued for about 2½ hours, with a gradual increase in the rainfall, and the rain then leveled off after about ⅓ of an inch had fallen. The rain stopped for about two hours, and at approximately 11:55 a. m. it started to rain very hard and the intense downpour continued for almost three hours. During this 3-hour period, the official rain gauge measured 6.75 inches of rainfall; from 11:55 a. m. until about 2:00 p. m. the gauge recorded approximately 5.85 inches of rainfall, according to Mr. Jensen's testimony. Mr. Jensen then testified as to the predictability of a storm of such intensity. Based

upon a technical report, Mr. Jensen testified that in this area one would expect a maximum rainfall of 3.15 inches within a 3-hour period to occur only once in a hundred years; and that the rainfall in question exceeded that figure by more than 3.50 inches. Mr. Jensen further testified: "It appears to be unprecedented and it is extraordinary. My series of records has shown nothing greater than what I have shown here". In testifying further, he stated: "I would never forecast, as a professional forecaster, I would never forecast that type of rain in a three-hour period because the odds of hitting a forecast like that are fantastic".

"THE COURT: But would you say it would, exercise of reasonable human foresight would anticipate that rain might have it may occur or that it isn't reasonable to expect and anticipate that would occur? Do you understand my question?

"A. I think I did. I do believe that it isn't reasonable to—

"THE COURT: To expect?

"A. To expect something like that type of rainfall to occur, from a forecaster viewpoint. This is what you are asking?

"THE COURT: I want your professional opinion.

"A. I would say that I wouldn't—I would never forecast rain like that, except a hurricane or something like that."

The Franks have cited as being factually similar to the case at bar, the case of Soules v. Northern Pac. Ry. Co., *supra,* wherein a rainfall which resulted in a flood in Dickinson in July of 1914 was held to be not so extraordinary as to warrant it being classified as an act of God, and the court held the Northern Pacific Railway Company liable for damages. In the *Soules* case, 4.03 inches of rain fell from 1:00 a. m. until 10:00 a. m. The facts were established in the *Soules* case

that such rainfall was neither unprecedented nor extraordinary. The intensity and duration of the rainfall in the *Soules* case was vastly different than in the case at bar. Accordingly, the *Soules* case is factually distinguishable from the case at bar. Thus we hold that the rainfall in the instant case was so unprecedented and extraordinary as to be an act of God. The general rule on the liability of bridge and road builders is expressed in 93·C.J.S. Waters § 20, at pages 629–630:

"A builder of a bridge, embankment, or other work is not bound to provide against floods of which the usual course of nature affords no premonition, but, if there was negligence in the construction of the bridge, embankment, or other work, which contributed to, or was the proximate cause of, the injury, and injury was reasonably foreseeable, it is no defense that the flood was unexampled or overwhelming. Although defendant may have been negligent in the construction of the bridge, trestle, or embankment, if, due to an unprecedented flood, the same injury to plaintiff would have occurred in the absence of such negligence, defendant's negligence is not the proximate cause of plaintiff's damage, and defendant is not liable therefor. An extraordinary flood is one the coming of which is not to be foreseen from the natural course of nature, and the destructiveness of which could not have been anticipated and prevented by ordinary foresight, while an ordinary flood is one, the repetition of which, although at uncertain intervals, by ordinary diligence could be anticipated."

Having determined that the rainstorm in question was so unprecedented and extraordinary as to constitute an act of God, we will, for the sake of argument, consider the issue of whether or not the construction of the bridge and roadway was a proximate cause of the damage to the Frank farmstead. The State of North Dakota and the County of Mercer had the benefit of expert testimony on hydraulics

from LeRoy Sorenson, an engineer. Following the June 24, 1966, flood, Mr. Sorenson made a thorough hydraulic study of the area in question. He testified that the bridge opening permitted a maximum flow of 3000 cubic feet per second of water and when the flow exceeded that figure, the water would overtop the bridge roadway. Mr. Sorenson testified that a 3000 cubic-feet-per-second flow would be in excess of the 100-year flood frequency. He testified that even if the grade and bridge would not have been there, the quantity of water flowing down the drainage basin was so great that the water would have risen to a point at which it would flood the Frank farmstead notwithstanding the highway. In addition, Mr. Sorenson indicated that there was little velocity at the location of the Frank farmstead, nor would there have been a great deal of difference in the velocity, regardless of whether or not the highway and bridge were there. One of the bases for his reasoning was that the magnitude of the flow of Coyote Creek at flood stage is about 1200 cubic feet per second; the bridge was designed and constructed to discharge water at a rate of approximately 3000 cubic feet per second, which is almost twice the cubic-feet-per-second flow of flood waters anticipated during a 100-year flood frequency magnitude; and the crest of the flood in question had a magnitude of 9000 cubic feet per second.

The Franks' expert witness, Harley Swenson, testified that he had not made an actual hydraulic study of the flood area, but he did make a professional assessment of it. Generally, his testimony revealed that it was his opinion that there was a possibility that the highway and bridge increased the velocity of the flow of the water as well as raising the elevation of the flood waters at the Frank farmstead. However, on cross-examination, Mr. Swenson said that he could not testify that the Frank farm would not have been flooded if no road or bridge had been built. Mr. Swenson testified further:

"Q. Well, let's put it another way. Suppose a breach in the road had never developed, would not the quantity of water passing north of the road at the high stage have been less because the present embankment was there, than if it had not been there?

"A. The quantity probably would have been quite comparable.

"Q. In other words, what you are saying is, the quantity would have been, to pass down here, would have been the same whether the embankment had been there or whether it weren't there. Is that right?

"A. That, in substance, approximately."

Mr. Swenson further testified that he agreed with Mr. Sorenson's calculation that at a distance of approximately 60 feet below the bridge outlet, the velocity of the flow of water would have almost totally decreased to equal the stream flow. Thus, the Franks' own expert witness has conceded that there would have been no appreciable difference between the flood conditions at the Frank farmstead whether the highway and bridge had been there or not. In Hamilton v. City of Bismarck, 71 N.D. 321, 300 N.W. 631, 633–634 (1941), this court said:

"Thus, we distinguish between an action for damages based upon negligence and an action based upon damage to private property for public use within the purview of Section 14 of the Constitution. That section of the Constitution does not bear upon damages resulting from negligence of public corporations or their agents; it deals with those damages that would normally flow from the exercise of the power of eminent domain."

■ This court held, in Northern Pacific Railway Co. v. Morton County, 131 N.W.2d 557, (N.D.1964), in paragraph 10 of the syllabus:

"The Constitution and the statutes, providing that private property shall not be damaged for a public use without just

compensation being paid the owner, place the burden upon the property owner to establish by a fair preponderance of the evidence that the public use is the proximate cause of the damage complained of."

Further, this court, in Northern Pacific Railway Co. v. Morton County, *supra* 131 N.W.2d at 567, cited 4 Nichols on Eminent Domain § 14.24 and quoted from that text:

"The damage must be direct and proximate and not merely such as is possible, as may be conceived by the imagination, or such as affects merely the feelings of the property owner."

It is apparent after reviewing the record de novo that the Franks have not satisfied the burden of establishing that the bridge and roadway were even one of the proximate causes of the flooding of their farm. The Frank farmstead would have been flooded notwithstanding the erection of the bridge and roadway in question and the flood was caused solely by an act of God.

For the reasons stated in the opinion, the judgment of the district court is reversed.

STRUTZ, C. J., and ERICKSTAD, TEIGEN and KNUDSON, JJ., concur.